OPINION
NIEMEYER, Circuit Judge:
Gordon R. Tatum, Jr. was convicted, following a bench trial, on three counts of bankruptcy fraud in violation of 18 U.S.C. § 152 and sentenced to three years on each count, the sentences to run consecutively. He was found guilty of concealing three automobiles (a Ferrari and two Mercedes Benz automobiles) from the trustee in bankruptcy and his creditors. He was also found guilty of giving false testimony about these automobiles, and others, and about his automobile restoration business at the meeting of creditors on April 11, 1984, and at a deposition conducted on December 6, 1984, in connection with the bankruptcy proceedings.
On appeal, Tatum contends that: (1) he was denied effective assistance of counsel because of multiple conflicts of interest; (2) his discharge in bankruptcy proceedings in which the United States (the IRS) was a creditor bars this action because of res judicata and collateral estoppel; (3) the elements of the crime were not proved; and (4) the district court’s 15-month delay in rendering a decision of conviction violated his right to a fair trial.
Because we conclude that Tatum’s counsel had conflicts of interest which deprived Tatum of the effective assistance of counsel during critical stages in the prosecution, we reverse and refhand the case for a new trial. We reject his argument that this prosecution is barred by res judicata or collateral estoppel, and his remaining points are rendered moot by our remand order.
I
Tatum was engaged in the business of restoring expensive and collectible automobiles, usually Ferrari and Mercedes Benz automobiles. He worked from two service bays located at 9085 and 9087 Comprint Court in Rockville, Maryland. Because of his lack of capital, he typically borrowed money from his customers to enable him to purchase the automobiles, and, after he purchased them, he used them as collateral for the loans. Once the automobiles were restored, he sold them and shared the prof-, its with the customers. For reasons that are not clear, however, Tatum became short of cash, and he began offering automobiles already collateralized as new collateral to obtain further loans from other lenders, including banks. By late 1983, he faced multiple civil judgments and decided to declare bankruptcy.
Before declaring bankruptcy, he formed a new corporation with his longtime mechanic, Andrew Greene, called GT Racing Limited, apparently to assist him in his prospective bankruptcy proceedings. He made Greene the president and sole stockholder of the company. He made himself the vice president. Even though GT Racing Limited never functioned as a corporation, in the forthcoming bankruptcy proceedings Tatum intended to make a distinction for disclosure purposes between personal assets and business assets which he attributed to GT Racing Limited. Also before declaring bankruptcy, Tatum moved a number of automobiles from his service bay at 9085 Comprint Court to 9087, which he then identified with the sign of a fictitious corporation, “Multi-Standard Corporation.”
On February 14, 1984, Tatum filed a “bare bones” bankruptcy petition, which he supplemented a couple of weeks later with the various required schedules. Although the bankruptcy petition form required him to disclose assets that he owned or that were in his possession, he failed to disclose any automobiles, allegedly upon the advice of counsel. The bankruptcy form also required him to disclose all automobiles transferred within the year immediately *374 preceding the bankruptcy filing. While Tatum had transferred, among other automobiles, two Mercedes Benz automobiles to William Mann well within the preceding year, he indicated on his petition that he had made no transfers, and he failed to list them as assets of his own or in his possession. At the time, Mann was associated with the law firm of Bernstein & Longest, which was advising Tatum on bankruptcy matters.
At the meeting of creditors on April 11, 1984, Tatum, repeating the positions he took in his bankruptcy petition, testified that he had no automobiles and that he had transferred no automobiles in the preceding year. He also stated in connection with GT Racing Limited that Greene was its only officer and that he and Greene held equal ownership interests. In fact, Tatum was the vice president of GT Racing Limited and Greene held all the stock. In practice, however, Tatum was the only person with control over the corporation. Greene apparently was Tatum’s mechanic who was paid a weekly wage. Similar statements were made in a deposition on December 6, 1984. The deposition was noticed in an adversary proceeding within the bankruptcy proceeding by one of the creditors of Tatum whose loan had been secured by a Ferrari.
When bankruptcy fraud was first being investigated by the government in 1986, Tatum retained David Gavin, a partner in the firm of Mann, Longest & Gavin, as his attorney. Mann, Longest & Gavin was a successor firm to Bernstein & Longest. In connection with the same investigation, Gavin also represented Tatum’s mechanic, Greene, in his testimony before the grand jury on December 4, 1986, and Mann, his own law partner, in his testimony before the grand jury on December 11, 1986. Gavin was also the partner of Darrell Longest, who had provided Tatum with bankruptcy advice. (Tatum contends that it was pursuant to the advice of these attorneys that he did not list the automobiles on the bankruptcy schedules filed on March 2, 1984, and that one of their files, which was lost or destroyed, would have exculpated Tatum by confirming that Tatum had in fact supplied his counsel with a list of the automobiles in preparation for the bankruptcy filings.)
When it became apparent to the government that Gavin might have conflicts of interest in representing Greene (Tatum’s mechanic), Mann (his law partner) and Tatum, the United States Attorney wrote Gavin advising him that these individuals (Greene, Mann and Tatum) “include the target and two subjects of investigation.” The letter also stated that the role of Darrell Longest (Gavin’s law partner who advised Tatum on bankruptcy matters) “raises many questions for us.” The letter suggested that the government would have to seek a decision from the presiding judge on these potential conflicts.
At or about the time of Tatum’s arraignment, the United States Attorney again wrote Gavin and stated,
Please be advised this office believes your firm has a serious conflict in continuing to represent Mr. Tatum inasmuch as you represented GT Racing Limited, Andrew Greene, and William A. Mann, a law partner of the firm. We believe this matter is serious enough that we are compelled to bring it to the court’s attention.
Thereafter, and still several months before trial, Paul F. Kemp, entered his appearance as counsel for Tatum. Although Kemp took the lead thereafter and the trial was conducted by him, Gavin sat at the trial table and continued to assist him. At the beginning of trial, when Kemp introduced Gavin to the court, he stated that the case was very complicated and that he needed the assistance of Gavin “to bring me up to speed in the investigation that has been going on for some years now.” Kemp pointed out, however, that he, and not Gavin, would ask the questions. The government, nevertheless, expressed continuing concern that Gavin would continue “as a member of the defense team because of those prior associations.” The government advised the court that Mann would be called as a government witness and Longest would be called as a defense witness. *375 In particular, it noted that Gavin, who represented Mann before the grand jury, would be in a position “to directly or constructively conduct a crossexamination of someone who is his client and law partner.” Kemp persisted in having Gavin available to assist him at trial, Acknowledging that Mann was an “intimate fact witness with respect to at least two of the Mercedes and one of the other automobiles indirectly, at least, involved in this case,” Kemp sought to allay the government’s concerns by noting that Gavin did not become a partner with Mann until 1986. At the same time, however, Kemp did acknowledge the benefit that Gavin would provide by being at the trial table because his knowledge of “the labyrinthine facts of this case is superior to mine.” The court in deferring a decision on the issue, stated, “It seems to me that it is a little premature to address these issues you have just mentioned.” J.A. 559.
Gavin continued to sit at trial table with Kemp throughout the trial, and Greene and Mann were called as government witnesses and Longest as a defense witness.
II
The right to counsel guaranteed by the Sixth Amendment in criminal cases assures that a defendant will be given the effective assistance of counsel. Effectiveness of representation is measured against a standard of reasonable competence. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Representation is ineffective when counsel’s performance has “so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.” Id. at 686, 104 S.Ct. at 2064. To be constitutionally significant, a deficiency in counsel’s performance must have a prejudicial effect on the defense of the case. Defining the prejudice required, the Supreme Court said:
The defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
466 U.S. at 694, 104 S.Ct. at 2068. The effectiveness of counsel under Sixth Amendment jurisprudence, therefore, is adjudged by (1) the competency of representation and (2) the prejudice which any alleged deficiency caused to the defense.
The effective performance of counsel requires meaningful compliance with the duty of loyalty and the duty to avoid conflicts of interest, and a breach of these basic duties can lead to ineffective representation. More than a mere possibility of a conflict, however, must be shown. The Sixth Amendment is implicated only when the representation of counsel is adversely affected by an actual conflict of interest. When counsel for a defendant in a criminal case has an actual conflict of interest when representing the defendant and the conflict adversely affects counsel’s performance in the defense of the defendant, prejudice to the defense is presumed and a new trial must be ordered. Cuyler v. Sullivan, 446 U.S. 335, 348-50, 100 S.Ct. 1708, 1718-19, 64 L.Ed.2d 333 (1980). In these circumstances, no prejudice need be shown because the conflict of interest is assumed to be harmful. Legal representation which is adversely affected by actual conflicts of interest is never considered harmless error. As the Supreme Court noted in Glasser v. United States, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942), “The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.” See also Holloway v. Arkansas, 435 U.S. 475, 490-91, 98 S.Ct. 1173, 1182, 55 L.Ed.2d 426 (1978) (a rule that required a defendant to show that a conflict prejudiced him would not be susceptible to intelligent, even-handed application).
The two requirements, an actual conflict of interest resulting in an adverse effect on counsel’s performance, are often intertwined, making the factual analyses of them overlap. An attorney has an actual conflict when he actively represents conflicting interests. Sullivan, 446 U.S. at *376 350, 100 S.Ct. at 1719. His representation of conflicting interests, however, is not always as apparent as when he formally represents two parties who have hostile interests. He may harbor substantial personal interests which conflict with the clear objective of his representation of the client, or his continuing duty to former clients may interfere with his consideration of all facts and options for his current client. When the attorney is actively engaged in legal representation which requires him to account to two masters, an actual conflict exists when it can be shown that he took action on behalf of one. The effect of his action of necessity will adversely affect the appropriate defense of the other. Moreover, an adverse effect may not always be revealed from a review of the affirmative actions taken. Rather, the failure to take actions that are clearly suggested from the circumstances can be as revealing. Thus, the failure of defense counsel to cross-examine a prosecution witness whose testimony is material or the failure to resist the presentation of arguably inadmissible evidence can be considered to be actual lapses in the defense. See Glasser, 315 U.S. at 72-75, 62 S.Ct. at 465-67. Likewise, a failure to act on behalf of a client before trial has representational significance. Thus, in Holloway, the Supreme Court cited examples of failures occurring before trial that, if attributed to a conflict situation, would constitute lapses in the defense:
For example, in this case it may well have precluded defense counsel for Campbell from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution, provided a lesser charge or a favorable sentencing recommendation would be acceptable.
435 U.S. at 490, 98 S.Ct. at 1181. See also Mannhalt v. Reed, 847 F.2d 576, 582 (9th Cir.) (“Exploring possible plea negotiations is an important part of providing adequate representation of a criminal client, and this part is easily precluded by a conflict of interest.”), cert. denied, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988).
With these principles in focus, we now analyze whether Gavin’s representation of Tatum denied Tatum his right to the effective assistance of counsel. Resolution of that question can lead to the yet more difficult one of whether Kemp’s representation of Tatum healed the adverse effects, if any, of Gavin’s failures.
Ill
The core allegations of criminal misconduct in this case emanate from Tatum’s failure to list certain automobiles on bankruptcy schedules.' Apparently, he and his attorneys were concerned about whether he needed to list them. One of his attorneys, Darrell Longest (a partner in Bernstein & Longest and later Mann, Longest & Gavin) testified about two meetings which he attended before Tatum declared bankruptcy. At these meetings, the status of the automobiles was discussed and Tatum was advised that the automobiles belonged to others. One of the persons who held two of the subject automobiles was Longest’s partner, Mann. Although the two Mercedes Benz automobiles, the concealment of which ultimately formed the basis of Tatum’s criminal liability, were in Mann’s possession, the ownership rights to them as between Tatum and Mann were not clear. As a result, Mann, too, was a subject of the grand jury’s investigation. Tatum contends that he structured his bankruptcy and prepared his schedules with the advice of these lawyers.
Thus, when Gavin undertook to represent both Tatum and his partner, Mann, he enmeshed himself in an active and irreconcilable conflict of interest. When representing Tatum, he could never fully develop the defense that Tatum relied on the advice of Bernstein & Longest (with which Mann was associated) and to attempt to shift responsibility to the firm. Were Gavin to do so, he would tend to inculpate his other client, Mann, and to increase the risk of civil malpractice liability of the firm in which both Mann and he were partners.
The conflict was further heightened by the dispute over the lost or destroyed file that was in the custody of Mann, Longest & Gavin. Tatum contends the file con *377 tained a list of all his automobiles, giving credence to his defense that his failure to list them on bankruptcy schedules was the product of legal advice. A file with that information, however, might have provided evidence which would have implicated the law firm. Independent representation of Tatum might well have required that Gavin be called as a witness to press for information relating to the circumstances of the file’s disappearance. As the lawyer representing Tatum, Gavin would not want to call himself to testify potentially against himself, even if he were permitted to become a witness, which is of some doubt. See Maryland Rules of Professional Conduct, Rule 3.7(a).
When Gavin also undertook the representation of Greene (Tatum’s mechanic and alleged partner) he engaged himself in another irreconcilable conflict. Greene and Tatum worked closely together and both were under grand jury investigation. Each was entitled to share with Gavin confidential attorney-client information with the reliance that it would not be used against him. That restriction prevented Gavin from representing both. The problem grew to a constitutionally disqualifying one when Greene became the key government witness in Tatum’s case. See United States v. Iorizzo, 786 F.2d 52, 57 (2d Cir.1986).
Finally, Gavin multiplied his disqualifying conflict when his own partners were identified as witnesses at trial, Mann for the government and Longest for the defense.
In this fog of torn and conflicting loyalties, Gavin could never conceive of seeking a plea agreement for Tatum. He could not, on behalf of Tatum, offer to cooperate by allowing Tatum to testify against his other clients, Mann or Greene, both subjects of the grand jury investigation. To do so would violate duties he owed to his other clients and would shift a potential for civil liability onto his firm and ultimately himself. See, e.g., Maryland Rules of Professional Conduct, Rule 1.8(g). He also could not assist Kemp at trial on behalf of Tatum in preparing for the cross-examination of his other clients, Greene and Mann. As it happened, both were cross-examined uncritically. With respect to the testimony of Greene, who was a key government witness, the district court, as factfinder, found him credible, and this was significant because there was evidence of material discrepancies between the testimony given by Greene at trial and testimony given by him in proceedings before trial.
The identified failures to seek a plea bargain, to cross-examine Greene critically, to be able to call himself as a witness on the lost file, and to attempt to shift liability from Tatum to others constituted “actual lapses” in legal representation. Sullivan, 446 U.S. at 349, 100 S.Ct. at 1718.
Having identified conflicts so multifaceted as Gavin’s, with their debilitating effect on Tatum’s representation, we are struck by the gross insensitivity of Gavin to his several ethical responsibilities. Rule 1.7 of Maryland Rules of Professional Conduct prohibits representation of a client if it will be adverse to another client or may be materially limited by the lawyer’s responsibilities to another client or to a third person or by the lawyer’s own interests, and Rule 1.9(a) prohibits representation of a client whose interests are materially adverse to the interests of the former client. Although the Maryland Rules of Professional Conduct did not become effective until January 1, 1987, several months after Gavin undertook the multiple representations in this case, the Model Code of Professional Responsibility which was applicable before then contained similar provisions. See DR 5-101 (refusing employment when the interests of the lawyer may impair his independent professional judgment); and DR 5-105 (refusing to accept or continue employment if the interests of another client may impair the independent professional judgment of the lawyer).
The government does not take serious issue with Gavin’s disqualifying conflicts of interest. Indeed, in its brief it concedes,
There can be little doubt that, had Gavin actually represented defendant at trial in the instant case, his conflict almost certainly would have left this court no *378 choice but to vacate defendant’s conviction on all counts and to remand the case for a new trial.
Supplemental Brief of Appellee at 12. It argues, however, that Gavin did not represent Tatum at trial and, at most, served as a consultant to Kemp. Arguing that the issue is fact intensive, the government contends that on the few facts presented in the record, a resolution on direct appeal of this issue is premature.
To determine whether Kemp was infected with the conflicts of Gavin presents the more difficult question. Nothing in the record shows that Kemp himself improperly represented conflicting interests, and the impediment, if any, could only be derivative from Gavin’s conflicts.
The parties agree that Gavin did not question witnesses at trial. But he did attend the trial daily as counsel for Tatum and sat at the trial table. Not only is this noted by the court reporter, but the court so noted it in an inquiry made when Gavin’s name came up in testimony: “Is the Mr. Gavin the Mr. Gavin who is seated at defense trial table?” The witness replied, “Yes, indeed, Your Honor.”
The government is correct in observing that the details of the relationship between Gavin and Kemp are not in the record. The general consulting function that Gavin served, however, is described by Kemp at several places in the record where Kemp stated:
Your Honor, also at counsel table is Mr. David Gavin, Esquire, of Rockville, Maryland, who represented Mr. Tatum throughout the grand jury stages of this case and in various attendant civil matters. He has, at the request of the defendant, been helping me throughout the presentation for this trial which, as Your Honor now knows, is very complicated, and he has been assisting me to try to bring me up to speed in the investigation that has been going on for some years now.
J.A. 555.
It is something in which I know the defendant [Tatum] would very definitely like to have Mr. Gavin to be available. I know that his knowledge of certainly of the labyrinthine facts of this case is superior to mine. I would at least like him available to assist me insofar as pointing out details that may come up.
J.A. 557.
The Court: Well, I gather from what Mr. Kemp said that Mr. Gavin is going to be more in a consultative stance than a participatory stance.
Mr. Kemp: That is correct, Your Honor.
J.A. 559.
In view of Kemp’s explicit comments about the need to have Gavin’s assistance because of his superior knowledge of the complex facts and because Gavin had been working on the case since 1986 and Kemp entered the case only several months before trial in 1988, it is reasonable to conclude that Kemp depended on Gavin to brief him on both the facts and the prior proceedings. From the necessary conclusions that Gavin was an acknowledged source of information to Kemp and Kemp (and apparently Tatum) felt the need to have Gavin present throughout the trial, we conclude that the presentation of Tatum’s defense was the product of both Gavin and Kemp, even though their contributions may have varied in function and degree. This joint effort by the two, when one was so completely disqualified, caused an unwitting, but disqualifying, taint to the other.
Thus, with Gavin assisting Kemp at the trial table, it would never occur to Kemp to call Gavin as a witness in an effort to shift to Gavin and his law firm the blame for the loss of the file containing possibly exculpatory evidence. With Gavin providing the factual support for the defense, daily counsel, and a full-time presence at trial, Kemp would be unable to focus on a larger strategic design of possibly implicating Gavin’s law firm as the source of Tatum’s criminal liability. When depending on Gavin, who represented both Greene and Mann, to develop facts for cross-examination against them, Kemp could not be expected to know that substantial impeachment testimony was available from prior testimony developed while Gavin was lawyer to Greene *379 and Mann. We can only conclude that because Kemp’s knowledge of the case and the avenues for defense depended on Gavin’s more complete knowledge, it was infected by Gavin’s conflicts. By his own statements, Kemp was not in a position at trial to overcome his lack of knowledge by an independent investigation from sources not tainted by conflicts of interest.
The conclusions we reach in this case are analogous to those in Hoffman v. Leeke, 903 F.2d 280 (4th Cir.1990), where we concluded that the presence at trial of one counsel without a conflict did not overcome the deficiency of counsel with a conflict of interest. As the court stated:
Therefore, regardless of the effectiveness of Doar’s efforts at trial, upon which we need not pass judgment, those efforts could not have overcome the presumed prejudice arising from Long’s actual conflict of interest.
Id. at 287.
Even if we were to consider only Gavin’s direct representation of Tatum, our conclusions in this case would not be different. Before Kemp entered his appearance for Tatum, Gavin’s representation resulted in an actual lapse, because he did not think to invite the government to alter the focus of its investigation from Tatum to his law firm as part of a plea bargain. As observed by the Supreme Court in Holloway, a conflict of interest has constitutionally detrimental effects before trial, just as during trial, “because of what it tends to prevent the attorney from doing.” 435 U.S. at 489-90, 98 S.Ct. at 1181.
We find that Gavin’s actual conflicts of interest adversely affected Tatum’s defense when he alone was representing Tatum and when at trial he assisted Kemp in representing Tatum, While Kemp alone did not represent conflicting interests, his defense of Tatum was tainted by his dependence on Gavin.
IV
The government has argued that any decision to review a conflict of interest is premature because facts of record have not been developed. This was also the view of the district judge who said, when presented with the issue at an early stage of the trial proceedings, “[I]t seems to me that it is a little premature to address these issues.” The reasonable assumption underlying this position is that the defendant is free to raise the issue by filing a habeas corpus petition under 28 U.S.C. § 2255 and then developing a full record through a collateral proceeding.
Typically the competency of counsel is best left for collateral review because, as the government points out, the record is usually inadequately developed. The record often reveals only ambiguous symptoms of a more complex set of relationships which cannot be adequately addressed on direct appeal. See United States v. Percy, 765 F.2d 1199, 1205 (4th Cir.1985); United States v. Mandello, 426 F.2d 1021, 1023 (4th Cir.1970).
When the risk of a conflict of interest is brought to the attention of the trial court, however, the court has the responsibility to investigate further, to advise the defendant personally, and to receive a knowing waiver if that is the expressed wish of the defendant. In the absence of waiver the court must resolve the question as it would any issue relating to the defendant’s right to counsel. “Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused.... The trial court should protect the right of an accused to have the assistance of counsel.” Holloway, 435 U.S. at 484, 98 S.Ct. at 1179 (quoting Glasser, 315 U.S. at 71, 62 S.Ct. at 465). In Wood v. Georgia, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981), the Court flatly stated that a conflict situation which is not addressed by the trial court requires reversal: “Sullivan mandates a reversal when the trial court has failed to make an inquiry even though it ‘knows or reasonably should know that a particular conflict exists.’ ” Id. 450 U.S. at 272 n. 18, 101 S.Ct. at 1104 n. 18 (emphasis in original, quoting Cuyler v. Sullivan, 446 U.S. 335, 347, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980)). Similarly, when a conflict situ *380 ation becomes apparent to the government, the government has a duty to bring the issue to the court’s attention and, if necessary, move for disqualification of counsel. Cf. United States v. Agurs, 427 U.S. 97, 110-11, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976) (although the government attorney must prosecute with “earnestness and vig- or,” he must also “be faithful to his client’s overriding interest that ‘justice shall be done’ ”) (citation omitted).
In this case the government did identify a conflict situation, but the issue was permitted to drop and consequently no hearing was conducted. We can appreciate the government’s desire to have a full record of Gavin’s involvement at trial and his advice on critical decisions made about plea bargaining, trial strategy, cross-examination, and the like. Any speculation on the issues before us could be allayed by testimony from Kemp and even from Tatum on the perceived impact on them of Gavin’s participation at trial. The price to pay for that luxury, however, is the delay of a new trial which inevitably would be required.
While we agree that the details are not of record, the facts essential to a decision on this issue are. Gavin undisputedly represented conflicting interests, beginning with his representation of Tatum, Greene and Mann before the grand jury on issues on which his own firm provided advice, and when his own partner was a subject of investigation. Kemp, who was the spokesman for the defense at trial, undeniably relied on Gavin for the development of facts and for unspecified assistance. The defense strategy at trial that is revealed by the record shows a failure to attempt to shift culpability to the law firm, and thereby attempt to divert responsibility from Tatum. This omission is especially glaring when the law firm provided the very advice which Tatum contends gave rise to his criminal responsibility. Other aspects of the defense at trial are consistent with this omission, which makes the lapse in the defense more troubling. For example, the potentially important file was lost, and Greene, a key government witness, was not critically cross-examined.
These known facts lead inevitably to the conclusion that Gavin had unacceptable conflicts of interest; that pretrial strategies were adversely affected by those conflicts; that trial counsel was dependent on Gavin for material aid in the defense; and that obvious avenues for a full defense were not pursued, avenues which might have assisted Tatum but would have clearly had adverse effects on Gavin and his law firm. When the record supports these conclusions, we may confront the issue on direct appeal. See Wood, 450 U.S. at 272, 101 S.Ct. at 1103; see also United States v. Grandison, 783 F.2d 1152, 1156-57 (4th Cir.) (dictum that “[i]n some cases, when the ineffectiveness appears on the trial record itself, we will hear such a claim [on direct appeal] without prior evidentiary hearings”), cert. denied, 479 U.S. 845, 107 S.Ct. 160, 93 L.Ed.2d 99 (1986).
V
Tatum also contends that his criminal prosecution is barred by the doctrines of res judicata and collateral estoppel. He argues that his discharge in bankruptcy adjudicates favorably to him any potential opposition to the discharge based on 18 U.S.C. § 152 (prohibiting various forms of bankruptcy fraud), the statute under which he was convicted. He contends that because the IRS, an agency of the United States, filed a claim in the bankruptcy proceeding for $10,423 and was a creditor with standing to oppose the discharge, the United States was bound by the discharge.
Relying on United States v. Mumford, 630 F.2d 1023 (4th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981), the government contends that res judicata does not apply. The discharge in bankruptcy did not resolve the same cause of action as that presented in the criminal prosecution under 18 U.S.C. § 152. The government also urges that even though the IRS and the United States Attorney are both arms of the Executive Branch of government, they have entirely different missions and powers. In respond- *381 ing to the collateral estoppel argument, the government argues that the fraud issue was not actually litigated in the bankruptcy proceeding, and resolution of that issue was not necessary to the discharge in bankruptcy.
The doctrine of res judicata applies to bar a second attempt to relitigate the same cause of action between the parties. Commissioner v. Sunnen, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948); Mumford, 630 F.2d at 1027. It applies to bar not only issues that were raised, but also issues that could have been raised in the earlier action. Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). Stated fully, the rule provides that
when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound “not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.”
Sunnen, 333 U.S. at 597, 68 S.Ct. at 719 (quoting Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195 (1877)). The rule’s purpose is to promote judicial efficiency and foster reliance on adjudications by putting an end to a cause of action once litigated.
The facts on which Tatum relies to invoke the defense are not disputed. On October 16,1984, Tatum as debtor obtained a discharge of his debts from the bankruptcy court. Several months later, in May 1985, relying on a lengthy affidavit supplied by the FBI, the trustee in bankruptcy petitioned the bankruptcy court to revoke the discharge on the ground that the discharge in bankruptcy was obtained through fraud because various automobiles were concealed. The bankruptcy court granted the petition to revoke the discharge and entered a preliminary injunction prohibiting Tatum from moving any automobiles from his shop. The trustee and Tatum thereafter entered into a settlement agreement which addressed the alleged claims of fraud. The agreement recited the trustee’s contentions of fraud and Tatum's denial of them. It then proceeded to state the agreement providing for specific dispositions of the automobiles alleged to have been improperly concealed. Following notice to all creditors, the bankruptcy court entered an order in July 1986 approving the settlement agreement. Although the IRS had filed a claim in the bankruptcy proceedings, it never filed a claim to set aside the discharge in bankruptcy for fraud and it did not participate in the settlement agreement between Tatum and the trustee. It took no position on the order of discharge, the motion to revoke the order of discharge, or the settlement agreement, although as a creditor, it had standing to participate. See 11 U.S.C. § 727(c).
Tatum’s argument that the discharge in bankruptcy bars the United States Attorney from subsequently prosecuting Tatum for bankruptcy fraud leads to several untenable conclusions which would multiply litigation and distort the purpose for the res judicata doctrine. The IRS, in order to make a claim against the estate and at the same time preserve a subsequent criminal prosecution against Tatum, would have to pursue an opposition to the bankruptcy based on fraud, even if to do so might be contrary to its interest. In prosecuting the opposition, the IRS would be required to duplicate the presentation of evidence that the United States Attorney would subsequently have to present in prosecuting the criminal case. Because Congress has not given the IRS the power to prosecute criminal cases, and the bankruptcy forum is not one designed or specified to resolve criminal prosecutions, there would always be a second trial on the criminal prosecution. Carried to its conclusion, therefore, Tatum’s argument would require a duplication of the factual presentations.
A bankruptcy proceeding and a criminal prosecution are fundamentally different proceedings, both in purpose and procedure, and the “causes of action” resolved by each are totally different. The pursuit of one proceeding will seldom resolve the *382 other. While it is arguable that the parties in this case are the same and the evidence for proving the elements of fraud might be the same, the similarity ends there. What we said in Mumford is applicable here: “[T]he difference between the present underlying claims with their differing elements and burdens of proof is so great that there exists two separate causes of action” and litigation of one will not preclude the other under the doctrine of res judicata. 630 F.2d at 1027 n. 4.
We therefore hold that a discharge in bankruptcy entered in a bankruptcy proceeding to which the IRS is a claimant does not, under the doctrine of res judicata, preclude a subsequent criminal prosecution for bankruptcy fraud when the IRS never pursued a claim to set aside the discharge in bankruptcy on grounds of fraud. To hold otherwise would frustrate the beneficial purposes of the res judicata doctrine to avoid duplication in litigation.
Collateral estoppel is a related doctrine with similar purposes. It is clear that collateral estoppel principles can be applied to narrower portions of an action than is the case for res judicata. But the preclusive effect of the doctrine applies only to issues actually decided or issues necessary to the prior judgment. Allen, 449 U.S. at 94, 101 S.Ct. at 414.
In this case the fraud issue was not actually decided by the bankruptcy court. While a discharge in bankruptcy cannot be entered when based on fraud, a discharge order does not resolve the issue of whether fraud occurred. Fraud may have never been raised or, as here, may have been suggested and the issue thereafter settled by the parties without any adjudication. The only adjudication necessary to the discharge here was approval of the settlement agreement as an acceptable compromise in the interests of the estate and its creditors.
For the reasons stated, we affirm the district court in denying application of the doctrine of res judicata and collateral es-toppel. However, because of the conflicts of interest that affected the performance of counsel for Tatum, we reverse and remand the case for a new trial. The remaining issues raised on appeal are rendered moot by our remand order.
REVERSED AND REMANDED.