PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                    }      No. 04-6092

JACK LAVELTON NICHOLSON,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Henry Coke Morgan, Jr., Senior District Judge.
(CR-01-41; CA-02-793)

Argued: September 20, 2006

Decided: February 2, 2007

Before KING and DUNCAN, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Reversed and remanded by published opinion. Judge King wrote the
opinion, in which Judge Duncan and Senior Judge Hamilton joined.

## COUNSEL

**ARGUED:** Marvin David Miller, Alexandria, Virginia, for Appellant. James Ashford Metcalfe, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF:** Terri J. Harris, LAW OFFICES OF MARVIN D. MILLER, Alexandria, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Michael J. Elston, Assistant United

States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

## OPINION

KING, Circuit Judge:

Petitioner Jack Lavelton Nicholson, a federal inmate serving a sentence imposed in the Eastern District of Virginia, has been awarded a certificate of appealability (the "COA") on the district court's denial of his 28 U.S.C. § 2255 motion for a writ of habeas corpus. *See Nicholson v. United States*, No. 2:02cv793 (E.D. Va. Oct. 15, 2003) (the "Opinion").[1] The COA, issued by this Court on November 10, 2004, relates to whether Nicholson's lawyer had an actual conflict of interest during Nicholson's sentencing proceedings and presents the question of whether his sentence should be vacated due to the denial of his Sixth Amendment right to effective assistance of counsel. As explained below, Nicholson's lawyer had an actual conflict of interest when Nicholson was sentenced, and we reverse and remand for a determination of whether that conflict adversely impacted the performance of his lawyer in Nicholson's sentencing proceedings.

### I.

### A.

Nicholson seeks to vacate his sentence, pursuant to § 2255, on the basis that his lawyer had an actual conflict of interest and provided him ineffective assistance of counsel in his sentencing proceedings. Under § 2255, a petitioner may collaterally attack his sentence and seek habeas corpus relief if "the sentence was imposed in violation of the Constitution or laws of the United States . . . ." 28 U.S.C. § 2255. After a district court has denied a § 2255 motion, the petitioner is not entitled to pursue an appeal unless he has been granted a COA, *see id.* § 2253(c)(1)(B), which may be issued only if the petitioner "has

---

[1]The Opinion, dated October 15, 2003, is found at J.A. 256-71. (Citations to "J.A. ___" refer to the Joint Appendix filed in this appeal.)

made a substantial showing of the denial of a constitutional right," *id.* § 2253(c)(2). The COA must indicate the specific issue or issues on which it is granted. *See id.* § 2253(c)(3). Although Nicholson pursued several ineffective assistance claims in the district court, he has been granted a COA on only one issue: "Did an actual conflict of interest cause [his] counsel to render constitutionally ineffective assistance when he failed to move for a downward departure?" *United States v. Nicholson*, No. 04-6092 (4th Cir. Nov. 10, 2004) (Order granting COA). Thus, this appeal is limited to an evaluation of that issue.

In connection with the COA, Nicholson asserts that his lawyer was operating under an actual conflict of interest at his August 29, 2001 sentencing hearing because, at that time, Nicholson's lawyer, Jon Babineau, was representing Nicholson as well as another client, Lorenzo Butts. Butts had previously threatened to kill Nicholson and his family, had attempted to kill Nicholson's brother, and had already killed Nicholson's step-father. Nicholson, who was convicted of a federal offense for his possession of a firearm and ammunition by a felon, asserts that he carried the handgun to protect himself from Butts. Nicholson maintains that Babineau, during the sentencing proceedings, failed to request a downward departure based on Nicholson's need to carry the handgun because, in so doing, Babineau would have accused his other client (Butts) of uncharged criminal conduct. Nicholson asserts that an actual conflict of interest thus existed, and that it adversely affected the performance of his lawyer during the sentencing proceedings, in contravention of his Sixth Amendment right to the effective assistance of counsel.

B.

1.

Nicholson was arrested on January 7, 2001 in Portsmouth, Virginia, on a state charge of possession of a firearm by a felon, after a police officer found a handgun on his person.[2] This charge was even-

---

[2]The facts underlying this appeal are primarily taken from the § 2255 motion and its supporting and opposing affidavits, and other materials submitted to the district court. The district court did not conduct an evidentiary hearing in this matter, and some allegations of the motion and affidavits are disputed. The court ruled that the evidence failed to show, by a preponderance of the evidence, an actual conflict of interest, and it denied Nicholson's § 2255 motion. *See* Opinion 9, 15.

tually dropped and replaced by a single federal charge of possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. §§ 922(g)(1), 942(a)(2), and (e). Nicholson was indicted by the federal grand jury on March 23, 2001, and he was taken into federal custody on April 3, 2001.

When the Virginia authorities first arrested Nicholson, he made statements to the arresting officers that he had obtained the handgun for his personal protection because he feared a man named Lorenzo Butts and his associates. These statements included the following: In early 2000, Nicholson's brother, Rudolph Nicholson, had agreed to assist federal officers in their attempts to uncover various criminal activities of Butts and his associates. Following this arrangement, on March 3, 2000, Rudolph was shot seven times by Butts's son, Vito, in Portsmouth. Although Rudolph survived this vicious attack, an assassin (dressed as a priest) attempted to enter Rudolph's hospital room in Norfolk, Virginia, where he was treated for two months (while under protective custody) and again tried to kill him. Around May 2000, Nicholson and his mother, Sandy Nicholson, were informed by federal officers that Butts had placed a contract on Nicholson's life, in an endeavor to have him killed and influence his brother Rudolph. On September 18, 2000, Charles Nicholson, Rudolph's father and Nicholson's step-father, was fatally shot multiple times by two men on a street in Portsmouth.

After his step-father was murdered, Nicholson obtained a handgun from a friend and left Portsmouth to stay with a cousin in Alexandria, Virginia. In early 2001, he returned to Portsmouth to meet with his probation officer. Nicholson still had the handgun, which did not work, in his possession. He had it repaired in Portsmouth on January 6, 2001. The next day Nicholson was stopped and searched by Portsmouth police officers, who found the handgun and arrested Nicholson for the illegal possession of a firearm.

2.

Following his January 7, 2001, arrest, Nicholson retained attorney Jon Babineau to represent him on the state charge, and that representation continued over to the subsequent federal charge. According to Nicholson's affidavit, he explained to Babineau on several occasions

that he only had the handgun to protect himself from Butts. Nicholson told Babineau that he was afraid of Butts because Butts had placed a contract on his life and had already killed Nicholson's step-father, threatened his mother, and attempted to kill his brother. Nicholson's mother, according to her affidavit, told Babineau that the only reason her son carried the firearm was his fear that Butts was going to kill him, and she also explained to Babineau Butts's other threatening actions against her family.

Babineau, on the other hand, has asserted by affidavit that Nicholson never advised him that he was fearful of Butts. Instead, he asserts that Nicholson told him that he needed the handgun for protection due to dangerous situations created by some activities in which he was involved, but he did not say that he feared he would be harmed by Butts. Babineau also stated that Sandy Nicholson (Nicholson's mother) only spoke with him about his attempts to get her son a downward sentencing departure for his substantial assistance to law enforcement — never mentioning Butts or his threats. When Babineau arranged for federal agents to debrief Nicholson, with a view toward providing substantial assistance, Nicholson informed the agents that he did not have any information regarding Butts and was not sure what Butts looked like. During discovery in the federal prosecution of Nicholson, Babineau received Nicholson's statements from the prosecutors. Those statements explain that Nicholson only carried the handgun for protection against Butts and his associates.

3.

On November 18, 2000, Butts was arrested by local and federal authorities in the Eastern District of Virginia on conspiracy, drug distribution, and firearms charges.[3] After a trial in federal court, Butts was found guilty on April 30, 2001, of multiple offenses. Babineau did not represent Butts at the trial but, on May 29, 2001, he served as Butts's counsel during a preliminary hearing conducted in Virginia state court on conspiracy, murder, and firearms charges. Both prior to and during the time Babineau was representing Butts in these state

---

[3]Nicholson apparently continued to carry his handgun after Butts and several of his associates had been arrested. The parties dispute, however, whether Nicholson knew that Butts was in custody at that time.

proceedings, Babineau was representing and advising Nicholson on whether he should accept a proposed plea agreement from the Government on Nichsolson's federal indictment.[4] Babineau never informed Nicholson that he was also representing Butts on state criminal charges, nor did Babineau seek Nicholson's consent to represent both clients during the same time frame. On May 1, 2001, the Government offered a plea agreement to Nicholson, and a plea hearing was scheduled for May 23, 2001. On May 22, 2001, Babineau informed the prosecutors that Nicholson had decided not to plead guilty at the scheduled hearing, but that Babineau believed Nicholson would eventually plead guilty.

On June 6, 2001, Nicholson pleaded guilty to the federal offense of possession of a firearm and ammunition by a felon, in violation of §§ 922(g)(1), 942(a)(2), and (e). His guilty plea was tendered without a plea agreement, because Nicholson would not agree to waive his right of appeal. During the Rule 11 plea colloquy, the Government acknowledged that it was reasonable to believe that someone might try to injure or shoot Nicholson. After Nicholson's plea proceedings, Butts terminated his initial counsel (Thomas Shuttleworth) in his ongoing federal proceedings and, on June 22, 2001, notified the district court that Babineau was his lawyer. Babineau then received the Presentence Investigation Report on Butts (the "Butts PSR"), which contained information implicating Butts in Rudolph's shooting and the murder of Nicholson's step-father. It also stated that Butts's "hit" list included Nicholson. On July 23, 2001, Nicholson's Presentence

---

[4]During the period leading up to his federal plea proceedings, Nicholson and Babineau discussed going to trial and seeking to interpose the affirmative defense of necessity. Babineau informed Nicholson that, in order to assert a successful necessity defense, he would have to testify at trial. Babineau further explained that, if Nicholson chose to testify, he would be subject to cross-examination on his prior criminal history. Nicholson asserts that Babineau, who was representing Butts during at least part of this time, discouraged Nicholson from pursuing a necessity defense because, in order to prove the defense, Babineau would have implicated Butts in additional uncharged criminal conduct. Nicholson also asserted an ineffective assistance claim in this regard. The district court's Opinion determined that this contention was not a valid claim. We did not award Nicholson a COA on this specific issue, and Babineau's advice on the necessity defense is not a subject of this appeal.

Investigation Report (the "Nicholson PSR") was issued, and it pointed out that Nicholson had advised the authorities that he carried the handgun for protection because he feared an individual who was trying to harm him.

On July 24, 2001, Babineau served as Butts's counsel at his sentencing proceedings in the Eastern District of Virginia. He also served as Butts's lawyer on his appeal to this Court, which was filed on July 31, 2001. As part of that appeal, Babineau maintained, inter alia, that the district court had erred by admitting trial evidence of Butts's prior bad acts, including evidence of the attempted murder of Rudolph and the murder of Nicholson's step-father. *See United States v. Butts*, No. 01-4606 (4th Cir. Nov. 18, 2002).

4.

The sentencing hearing for Nicholson was conducted in the district court on August 29, 2001. During the hearing, Babineau sought a downward departure under section 5H1.4 of the Sentencing Guidelines because of Nicholson's health, which the district court denied.[5] At the hearing, the prosecutors advised the court that certain individuals were trying to kill Nicholson at the time of his arrest. Nicholson explained to the court that he only carried the handgun to protect himself from the persons who had killed his step-father and had attempted to kill his brother. Babineau, however, did not mention any of the circumstances surrounding Nicholson's arrest, nor did he request a downward departure based on the self-defense necessity of Nicholson carrying the handgun. At the conclusion of the hearing, the court adopted the Nicholson PSR, accepting the recommendation of a base offense level of 30 with a criminal history category of VI. This placed Nicholson in the Guidelines range of 168-210 months. The statutory minimum for Nicholson's offense, however, was 180 months, and the court sentenced him to 189 months.[6]

---

[5]Nicholson had been diagnosed with sickle cell amenia when he was a child and testified at the sentencing hearing that he is typically hospitalized for the disease five or six times a year.

[6]Based on his criminal history, Nicholson was sentenced as an armed career criminal under 18 U.S.C. § 924(e). Because he was deemed to be an armed career criminal, Nicholson faced a mandatory minimum of 180 months and a maximum of life.

5.

Nicholson thereafter appealed the district court's denial of a downward departure based on his poor health. His sentence was affirmed by our unpublished opinion of June 10, 2002. *See United States v. Nicholson*, 36 Fed. Appx. 151 (4th Cir. 2002). On June 6, 2003, Nicholson filed his § 2255 motion in the Eastern District of Virginia, claiming ineffective assistance of counsel. By its Opinion of October 15, 2003, the court, without conducting a hearing, denied relief. *See* Opinion 15. In so ruling, the district court concluded that Babineau's simultaneous representation of Butts and Nicholson did not create an actual conflict of interest because Babineau was not representing Nicholson and Butts in cases arising from the same set of circumstances. *See id.* at 9. The court further concluded that, even if there was a conflict of interest, any necessity defense interposed by Nicholson at trial would have been unsuccessful. *See id.* at 13. The court did not address whether it would have been objectively reasonable for Babineau to seek a downward sentencing departure based on necessity and self-defense.[7]

Nicholson applied for a COA on December 4, 2003, and, on November 10, 2004, we granted the COA on whether an actual conflict of interest caused Babineau to render constitutionally ineffective assistance when he failed to move for a downward departure in Nicholson's sentencing. We possess jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.[8]

---

[7]The COA issue was asserted by Nicholson in the district court. *See* Pet. Mem. in Supp. of Mot. to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 ¶ 62. His § 2255 motion focused primarily, however, on Babineau's advice concerning the assertion of the affirmative defense of necessity in a trial.

[8]Nicholson sought, in his opening brief, to expand his COA. We denied this request on June 27, 2005. Prior to oral argument of this appeal, Nicholson submitted a Rule 28(j) letter and then a Supplemental Motion to Accept Attachments to Appellant's Reply Brief, the attachments being a Virginia ethics opinion and a timeline of events. We grant the motion to accept attachments with respect to the Virginia ethics opinion, but deny the motion with respect to the timeline of events. We deny as moot the Government's motion to strike Nicholson's Rule 28(j) submission.

## II.

In general, in an appeal relating to the denial of a § 2255 motion, we review a district court's legal conclusions de novo. *See United States v. Roane*, 378 F.3d 382, 395 (4th Cir. 2004). Because the district court denied relief without a hearing, it was not able to make findings of fact on disputed factual issues. Although the court did not characterize its disposition of this matter as either a dismissal or an award of summary judgment (but simply as a denial of § 2255 relief), it did weigh and consider the affidavits and other materials submitted by the parties. Thus, its ruling was in the nature of a summary judgment award to the Government.[9] In reviewing an award of summary judgment, we review the facts in the light most favorable to the nonmoving party, which, in this appeal, is Nicholson. *See Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 418 (4th Cir. 2004). We review de novo any mixed questions of law and fact addressed by the district court on whether the petitioner has established a valid Sixth Amendment ineffective assistance claim. *See Smith v. Angelone*, 111 F.3d 1126, 1131 (4th Cir. 1997) ("Whether counsel's performance was constitutionally adequate is a mixed question of law and fact which we review de novo." (internal quotation marks omitted)).

## III.

In support of his COA, Nicholson contends that the district court erred in concluding that Babineau's simultaneous representation of Butts and Nicholson, as spelled out above, did not create any actual conflict of interest, and thus did not result in Nicholson being provided with constitutionally ineffective assistance. The Sixth Amendment guarantees an accused the right to effective assistance of counsel, *see Strickland v. Washington*, 466 U.S. 668, 686 (1984), and an essential aspect of this right is a lawyer "unhindered by conflicts of interest." *Mickens v. Taylor*, 240 F.3d 348, 355 (4th Cir. 2001) (en banc), *aff'd*, 535 U.S. 162 (2002); *see also Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980). In general, to prevail on an ineffective assis-

---

[9]In its Opinion, the district court characterized Nicholson's claim as a civil action, in which he was obliged to establish his allegations by a preponderance of the evidence. *See* Opinion 4.

tance claim, a petitioner must establish (1) that his lawyer's performance was deficient by showing that his performance fell below an objectively reasonable standard, and (2) that his deficient performance prejudiced the petitioner's case. *See Strickland*, 466 U.S. at 687; *see also Mickens*, 240 F.3d at 355.

We have recognized that, as a general proposition, "[t]he effective performance of counsel requires meaningful compliance with the duty of loyalty and the duty to avoid conflicts of interest, and a breach of these basic duties can lead to ineffective representation." *United States v. Tatum*, 943 F.2d 370, 375 (4th Cir. 1991). When a petitioner premises his ineffective assistance claim on the existence of a conflict of interest, the claim is subjected to the specific standard spelled out in *Cuyler v. Sullivan*, 446 U.S. 335 (1980), instead of that articulated in *Strickland*. *See Strickland*, 466 U.S. at 692. To establish that a conflict of interest resulted in ineffective assistance, "[m]ore than a mere possibility of a conflict . . . must be shown." *Tatum*, 943 F.2d at 375 (emphasis removed). The petitioner must show (1) that his lawyer was under "an actual conflict of interest" and (2) that this conflict "adversely affected his lawyer's performance." *Sullivan*, 446 U.S. at 348. If the petitioner can show an actual conflict, and that it adversely affected his lawyer's performance, prejudice is presumed and there is no need to demonstrate a reasonable probability that, but for the lawyer's conflict of interest, the trial or sentencing outcome would have been different. *See Sullivan*, 446 U.S. at 349-50. In evaluating and applying these principles, we recognize that an adverse effect is not presumed from the existence of an actual conflict of interest. *See Mickens*, 240 F.3d at 360. That said, we assess each of the two prongs of the *Sullivan* test in turn, that is, (1) whether Babineau had an actual conflict of interest, and (2) whether that conflict adversely affected Babineau's performance in Nicholson's sentencing proceedings.

## A.

Nicholson first contends that the district court erred in concluding that there was no actual conflict of interest when Babineau simultaneously represented both Nicholson and Butts. To establish an actual conflict of interest, Nicholson "must show that [his] interests diverged with respect to a material factual or legal issue or to a course of action." *Gilbert v. Moore*, 134 F.3d 642, 652 (4th Cir. 1998) (en banc)

(internal quotation marks omitted); *see also Tatum*, 943 F.2d at 376 (concluding that actual conflict of interest exists when lawyer is required to "account to two masters" or when lawyer fails to take action on behalf of one client because it would adversely affect another).

By its Opinion, the district court determined that Babineau was not operating under an actual conflict of interest, because he was not representing "both defendants or potential defendants in an action arising from the same set of circumstances or transactions." Opinion 9. The court determined that Babineau was not required to attack the innocence of one client in order to serve the other, as Butts was not facing any charges related to having contracted for the killing of Nicholson. *See id.* The court also reasoned that Nicholson was never in the position of having to testify against Butts, nor Butts against Nicholson, and that Nicholson and Butts never had any direct contact with each other. *See id.*

Contrary to the district court's ruling, Babineau's representation of Nicholson and Butts created an actual conflict of interest. Although Nicholson and Butts were not charged with offenses arising out of the same set of circumstances, Nicholson's interests, on the one hand, and Butts's interests, on the other, were in total opposition to each other during Babineau's simultaneous representation of them. On this record, Nicholson and his mother each advised Babineau that the only reason Nicholson carried the handgun was to protect himself from Butts and his associates. Importantly, Babineau had received and knew, through Nicholson's statements to police officers (which Babineau had secured in the federal discovery proceedings relating to Nicholson's indictment), that Butts had placed a "hit" on Nicholson, that Butts had attempted to kill Nicholson's brother, and that Butts had murdered Nicholson's step-father.

Furthermore, the Butts PSR discussed the involvement of Butts in the attempted murder of Nicholson's brother and the murder of Nicholson's step-father. That PSR, which was made available to Babineau in connection with his representation of Butts, also revealed that Butts had put out a "hit" on Nicholson. In addition, at the time of Nicholson's sentencing, Babineau was preparing to contend in Butts's appeal to this Court that the evidence of violence against Nicholson's

family had been improperly admitted at Butts's trial. If Babineau had pursued a downward departure motion based upon Nicholson's necessity to carry the handgun for self defense, he would have been obliged to assert that Nicholson's fear of Butts was real. *See* U.S.S.G. § 5K2.12 ("If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may decrease the sentence below the applicable guideline range . . . . Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury . . . ."). In so doing, Babineau would, in seeking a downward departure for Nicholson, necessarily have accused his other client, Butts, of uncharged criminal conduct.

It is clear to us that Babineau's actions were in contravention of the applicable ethical standards. When Babineau undertook his representation of Nicholson, it had been established that "[d]efense counsel have an ethical obligation to avoid conflicting representations . . . ." *Sullivan*, 446 U.S. at 346. And the Virginia Rules of Professional Conduct prohibit a lawyer from representing a client if that representation would affect the interests of another client. *See* Va. Rules of Prof'l Conduct 1.7(b). A lawyer can only avoid such a conflict, and continue representation, if (1) the lawyer reasonably believes that he would be "able to provide competent and diligent representation to each affected client," (2) "the representation is not prohibited by law," (3) "the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in . . . other proceedings before a tribunal," and (4) each client consents in writing. *Id.* The Virginia rules make it clear that "[l]oyalty to a client is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client." Va. Rules of Prof'l Conduct 1.7(b) cmt. 8.

In responding to a hypothetical situation posed by Nicholson's current counsel, the Virginia State Bar Standing Committee on Legal Ethics has opined that "the defense attorney in this hypothetical had an impermissible conflict of interest in representing these two defendants . . . ." Va. State Bar Standing Comm. on Legal Ethics, Informal

Op. 1796 (2004).[10] Based on the factual scenario presented to the Committee, it concluded that nothing in the facts could have supported a lawyer's belief that his representation of one client would not have adversely affected his representation of the other. *See id.*[11]

---

[10]Although this ethics opinion is not binding on us, it is worthy of consideration and is entitled to such weight, if any, we desire to accord it. *See Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 149-50 (1968) (recognizing that Rules of American Arbitration Association and Canons of Judicial Ethics are not binding authority, but that they are "highly significant"). The Virginia Bar's opinion is consistent with the conclusion we have reached, and it demonstrates that the appropriate legal ethics body of the Commonwealth of Virginia is in substantial agreement with our view. We deem the opinion to be of some significance, but not as binding authority.

[11]The hypothetical set of facts presented to the Committee by Nicholson's lawyer are substantially similar to those underlying this appeal, and they were recited by the Committee as follows:

> You have presented a hypothetical situation involving a defense attorney defending two criminal defendants in separate cases. Defendant #1 retained the attorney to represent him on a charge of possession of a firearm as a convicted felon in state court. Defendant #1 told the police at the time of his arrest that he had a gun solely to protect himself from Defendant #2, who had shot his brother, murdered his step-father, and placed a contract on Defendant #1's life. The state weapons charge was dismissed against Defendant #1. He was then charged with a federal weapons charge for the same firearm. Defendant #1 again hired the attorney for the federal case. Defendant #2 then hired that same attorney to represent him in state court on charges of first degree murder, abduction, conspiracy to commit murder, possession of a firearm by a convicted felon, and use of a firearm in the commission of a felony. Defendant #1 told the attorney he did not want to plead guilty to the firearms charge because he had the gun solely to protect himself from Defendant #2. The case was set for trial. The attorney reviewed discovery materials which identified Defendant #2, his client, as the person Defendant #1 feared. The attorney did not disclose to either client or either court that he represented both Defendant #1 and #2. The attorney persuaded Defendant #1 to plead guilty, forego raising the self-defense issue, and forego implicating Defendant #2. Defendant

Even assuming that Babineau reasonably believed that he could adequately represent both Nicholson and Butts, his simultaneous representation of both defendants necessarily placed him in the position of having to make claims against Butts in order to pursue a downward departure motion, on the basis of self-defense necessity, in Nicholson's sentencing hearing. Thus, Babineau had to "pull his punches" at Nicholson's sentencing hearing in order to avoid accusing his other client, Butts, of uncharged criminal conduct. Although Babineau had an ethical duty to fully inform Nicholson of his representation of Butts, he failed to do so. Babineau, in representing Nicholson, was thus in the untenable position of having to place the interests of one client (either Butts or Nicholson) above another (either Nicholson or Butts) at Nicholson's sentencing hearing. Babineau was thus impaired by an actual conflict of interest in the context of those proceedings.

B.

Finally, Nicholson contends that Babineau's conflict of interest adversely affected his performance in Nicholson's sentencing hearing.[12]

---

#1 was sentenced to fifteen years imprisonment. Defendant #2 was sentenced to 105 years imprisonment. The attorney accepted the court appointment to represent Defendant #1 in his appeal; he again did not disclose to clients or the court that he represented each of these defendants. Defendant #1's conviction and sentence were affirmed.

Va. State Bar Standing Comm. on Legal Ethics, Informal Op. 1796 (2004).

[12]The Government maintains that there was no adverse impact on Nicholson because it was not objectively reasonable for Babineau to move for a downward departure, as Nicholson's minimum Guidelines sentence was already lower than the statutory minimum. Nicholson, however, was required to move for a downward departure prior to the court's final sentencing decision and, at that time, the Nicholson PSR's recommendation was merely that — a recommendation. Furthermore, Babineau actually moved for a downward departure based on another theory (Nicholson's health situation). Although a motion for a downward departure on self-defense necessity may have proven futile, the advancement of that theory, along with the presentation of supporting evidence, may have convinced the court to sentence Nicholson to the statutory minimum instead of, as imposed, nine months above the minimum.

To establish an adverse effect, a § 2255 petitioner must satisfy, by a preponderance of the evidence, a three-part standard. *See Mickens*, 240 F.3d at 361. He must, first of all, "identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued." *Id.* Second, he must establish that "the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision." *Id.* In order to satisfy this second prong, "the petitioner must show that the alternative strategy or tactic was 'clearly suggested by the circumstances.'" *Id.* (quoting *Tatum*, 943 F.2d at 376). Lastly, he must show that "the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." *Id.* In establishing these three aspects of this test, the petitioner is not required to show that the strategy or tactic not taken would have been successful, but only that it would have been objectively reasonable. *See id.*

We have recognized that "much of the adverse effect inquiry is heavily fact dependent," and we are thus obliged, on appellate review, to defer to a habeas court's findings of fact. *Mickens*, 240 F.3d at 360. In this situation, however, the habeas court did not conduct a hearing and resolve the disputed factual contentions. It also did not reach and address whether Babineau's conflict adversely affected his performance in Nicholson's sentencing proceedings, when Babineau failed to move for a downward departure for self-defense necessity.[13] Thus, there are material factual issues yet to be addressed and determined

---

[13]The district court, in its Opinion, considered whether Babineau's advice to Nicholson to forego a self-defense necessity defense at trial, and instead plead guilty, created an adverse effect on Babineau's performance. *See* Opinion 10-13. The Government suggests that the court's conclusion that the necessity defense would have been unsuccessful indicates that a motion for downward departure would have also been unsuccessful. This position is unsound for at least two reasons. First, however, Nicholson does not have to show that the motion for a downward departure would have been successful, but rather that it would have been objectively reasonable for such a motion to be made. *See Mickens*, 240 F.3d at 360. Second, the standard for a downward departure based on self-defense necessity at sentencing is not as stringent as the standard for the necessity affirmative defense at trial. *See* U.S.S.G. § 5k2.12 (providing that downward departure can be granted when circumstances do not amount to successful affirmative defense).

in this case. In these circumstances, we are obliged to remand for a determination and assessment of the relevant facts, and for such other and further proceedings as may be appropriate.

## IV.

Pursuant to the foregoing, we reverse the district court's ruling that an actual conflict of interest did not exist, and remand for a determination on whether Babineau's conflict adversely impacted his performance in Nicholson's sentencing proceedings.

*REVERSED AND REMANDED*