Richard Thomas STITT, Petitioner,

v.

UNITED STATES of America,
Respondent.

No. CRIM.A. 2:98CR47.

United States District Court,
E.D. Virginia,
Norfolk Division.

April 1, 2005.

Richard Thomas Stitt, Pro se.

## *MEMORANDUM OPINION & ORDER*

JACKSON, District Judge.

Before the Court is the Motion of Richard Thomas Stitt ("Petitioner") to Vacate, Set Aside or Correct a Sentence Previously Imposed pursuant to 28 U.S.C. § 2255. Specifically, Petitioner contends that his sentence is invalid because (1) he received ineffective assistance of counsel, (2) he was denied learned counsel, (3) a thirteenth juror deliberated, (4) the Government withheld evidence, (5) the death penalty is unconstitutional, and (6) the Government's expert has recanted his testimony. For the reasons set forth below, Petitioner's motion to vacate, set aside, or correct his sentence of death is **GRANTED**.

## I. FACTUAL & PROCEDURAL HISTORY

On April 14, 1998, a federal grand jury indicted Petitioner and twelve co-defendants in a thirty-one count indictment. Petitioner was charged with numerous violations of federal laws involving narcotics, firearms, and murders related to drug trafficking.[1] On September 8, 1998, jury trial proceedings began. On October 16, 1998, the trial jury entered a verdict of guilty on fourteen counts, including conspiracy to distribute and possession with intent to distribute cocaine base, pursuant to 21 U.S.C. § 846;[2] engaging in a continuing criminal enterprise ("CCE"), pursuant to 21 U.S.C. §§ 848(a) & (c); three counts of murder during a CCE, pursuant to 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2; two counts of using and carrying a firearm during and in relation to a crime of violence and two counts of using and carrying a firearm during and in relation to a drug trafficking crime, all pursuant to 18 U.S.C. § 924(c); murder with a firearm during a drug trafficking crime, pursuant to 18 U.S.C. § 924(i) and 18 U.S.C. § 2; possession of a firearm by a felon, pursuant to 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 2; and three counts of possession with intent to distribute cocaine base, pursuant to 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. On October 26, 1998, the penalty phase proceedings began before a jury. The penalty phase jury returned a verdict of Death on counts Three, Five, and Seven on November 6, 1998.

The Court entered its Judgment of Conviction on February 17, 1999, sentencing Petitioner to 780 months of imprisonment and death on each of the three murder convictions. The United States Court of

---

1. A more detailed description of the facts leading up to Petitioner's arrest can be found in the *United States v. Stitt,* 250 F.3d 878 (4th Cir.2001).

2. As a lesser included offense of the continuing criminal enterprise, the conspiracy conviction was vacated upon the Government's motion

Appeals for the Fourth Circuit ("Fourth Circuit") affirmed Petitioner's conviction on May 25, 2001. On May 13, 2002, the United States Supreme Court ("Supreme Court") denied certiorari.

Petitioner filed this current motion to Vacate, Set Aside or Correct a Sentence Previously Imposed pursuant to 28 U.S.C. § 2255 on May 13, 2003. On May 23, 2003, the Court ordered the Government to file a response within sixty days. The Court extended the Government's time to respond upon motion from the Government. The Government filed its response on October 8, 2003. On December 5, 2003, Petitioner replied to the Government's response. The Government's response and Petitioner's reply both exceeded the page lengths allowed by the local court rules.

On February 18, 2004, the Court ordered the parties to submit new memoranda in accordance with the page lengths required by the local court rules. Petitioner filed his Amended Reply to the Government's Response on March 18, 2004.[3] On April 6, 2004, the Government filed its Amended Response. The Court held two evidentiary hearings regarding issues raised by the parties. During the first hearing on July 15, 2004, Dr. Thomas V. Ryan, Ph.D. ("Dr.Ryan") testified on behalf of Petitioner. At the second hearing on August 2, 2004, the Government presented testimony from Petitioner's trial counsel, Norman Malinski ("Malinski"). Petitioner then had three witnesses testify in rebuttal: Franklin Swartz ("Swartz"), Petitioner's local counsel; Douglas Fredericks ("Fredericks"), counsel for one of the co-defendants in the 1998 trial; and Linda McGrew ("McGrew"), a fact investigator

and mitigation specialist for the Richmond Division's Federal Public Defender's Office. The Court sets forth the relevant facts below.

Petitioner was arrested on February 14, 1998. His initial appearance before the Court was on February 17, 1998. Petitioner retained Malinski, who had represented Petitioner on prior occasions, as his counsel. (Tr. 2255 Hr'g 8/2/04 at 57.) At that time, Malinksi was out of the country, but Malinski's partner met with Petitioner and with Swartz, who served as local counsel. (Tr. 2255 Hr'g 8/2/04 at 51, 97–98.) Swartz first appeared for Petitioner on February 26, 1998. On May 13, 1998, Malinski was granted admission *pro hac vice* to represent Petitioner before this Court.

On June 16, 1998, Malinski mailed a letter to Assistant United States Attorney Fernando Groene ("AUSA Groene") regarding a Department of Justice Conference scheduled on June 18, 1998, where the Government would request to seek imposition of the death penalty if Petitioner was found guilty of the capital offense charges. Malinski informed the Government that he would not be present at the conference because he had no meritorious argument to make on the facts or in mitigation. (Letter from Malinski to Groene of 6/16/98, at 1–2.) Malinski complained that the discovery he had received was late and incomplete. (*Id.* at 1.) He also asserted that he had no notice that the Government intended to pursue the death penalty until one week prior to his letter. (*Id.* at 2.) On June 23, 1998, the Government filed its notice of intent to seek the death penalty.

---

**3.** Although Petitioner filed a new brief, Petitioner relies upon the attachments that he previously filed with his December 5, 2003 reply brief. Given the significant amount of material attached to the prior submission

(over forty separate attachments), and given the fact the duplication of such material would have been a waste of resources, the Court will refer to the attachments as Amended Reply exhibits.

On September 8, 1998, the jury trial began. It is not clear from the record when exactly Malinski began preparation for the sentencing phase. Shortly before August 8, 1998, Malinski requested information regarding the mental health treatment of Petitioner's mother, Valerie Pleas ("Pleas"), from the Commonwealth of Virginia, Eastern State Hospital. (Tr. 2255 Hr'g 8/2/04 at 63 & Pet'r Ex. 26.) Malinski did not discuss any preparations he might or might not be making with any other members of the defense team or the counsel for the other co-defendants. (Decl. Protogyrou ¶ 5; Decl. Swartz ¶ 12.) At Malinski's request, on September 18, 1998, Dr. Thomas Pasquale ("Dr.Pasquale"), a clinical psychologist, began a review of Petitioner's background as Petitioner's expert witness. (Pl. Am. Reply Ex. 40.) Malinski had his first meeting with Pasquale on September 24, 1998. (Id.) At some point during this period, Malinski discussed the case with Mark D. Cunningham, Ph.D ("Dr.Cunningham"), and had planned to hire Dr. Cunningham as an expert, but could not obtain the funds to do so. (Tr. 2255 Hr'g 8/2/04 at 43–47, 78–79.)

When the penalty phase began on October 26, 1998, the Government did not choose to make Petitioner's mental health an issue during its presentation. Malinski introduced the issue as a mitigating factor. As a result, Malinski elicited testimony from Dr. Pasquale regarding Petitioner's future dangerousness and a psychological instrument called the Psychopathy Checklist–Revised ("PCL–R"). In rebuttal, Dr. Ryan testified as an expert witness for the Government on the issue of Petitioner's future dangerousness. (Decl. Ryan ¶ 1.) Dr. Ryan testified "about the defining characteristics of psychopathy and about the utility of the PCL–R as a predictor of future violence in prison." (Id. at ¶ 2.) Based upon Petitioner's score on the PCL–

R, Dr. Ryan testified that Petitioner was a psychopath and would be a future danger for violence if he received a life sentence in prison. (Id. at ¶ 2.) Dr. Ryan predicted that Petitioner would not be treatable or subject to rehabilitation, and that Petitioner would continue to be violent after most violent offenders had "burned out." (Id. at ¶ 4.)

Petitioner claims that the penalty phase was rife with errors, falsehoods, and incompetence on the part of Malinski, the Court, and the Government. This matter is now ripe for determination by the Court.

## II. STANDARD OF REVIEW AND BURDEN OF PROOF

Title 28 U.S.C. § 2255 provides in pertinent part:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255. A petitioner collaterally attacking his sentence or conviction pursuant to § 2255 bears the burden of proving his grounds for collateral attack by a preponderance of the evidence. *Miller v. United States*, 261 F.2d 546 (4th Cir.1958); *Vanater v. Boles*, 377 F.2d 898, 900 (4th Cir.1967). In deciding a § 2255 motion, the Court need not hold a hearing if "the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. Furthermore, if the mo-

tion is brought before the judge that presided over the conviction, the judge may rely upon recollections of previous events. *Blackledge v. Allison,* 431 U.S. 63, 74 n. 4, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977); *Carvell v. United States,* 173 F.2d 348, 348–49 (1949) (stating it is highly desirable that § 2255 motions "be passed on by the judge who is familiar with the facts and circumstances surrounding the trial, and is consequently not likely to be misled by false allegations as to what occurred.").

■ If the issues raised by a petitioner have been fully considered by a court on appeal, the petitioner may not raise them again under the guise of a collateral attack. *Boeckenhaupt v. United States,* 537 F.2d 1182, 1183 (4th Cir.1976). It should also be noted that the burden on a petitioner collaterally attacking his sentence under § 2255 is heavier than his burden on appeal. Therefore, to obtain relief, a petitioner must meet the two part "cause and actual prejudice" test. *United States v. Frady,* 456 U.S. 152, 167–68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Under that test, "[t]o obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." *Id.; United States v. Maybeck,* 23 F.3d 888, 890 n. 1 (4th Cir.1994). This standard presents "a significantly higher hurdle than would exist on direct appeal." *Frady,* 456 U.S. at 166, 102 S.Ct. 1584. If the petitioner fails to meet the "actual prejudice" prong of the test, the Court need not address whether the petitioner has shown cause. *See id.* at 168, 102 S.Ct. 1584.

## III. DISCUSSION

Petitioner has raised a number of claims including (1) ineffective assistance of counsel; (2) denial of learned counsel in a capital case; (3) presence and participation of a thirteenth juror during deliberations; (4) the Government's withholding of evidence and use of false evidence; (5) a challenge to the constitutionality of the death penalty; and (6) a challenge to the testimony given by the Government's expert witness. The Court addresses each of these claims in turn.

### A. Ineffective Assistance of Counsel

■ Petitioner claims ineffective assistance of counsel, in violation of the Sixth Amendment. Ineffective assistance of counsel claims are governed by the settled doctrine of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The fact that Petitioner had retained counsel rather than appointed counsel does not entitle Petitioner to any less protection under the Sixth Amendment. *Mickens v. Taylor,* 535 U.S. 162, 169 n. 2, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002); *Cuyler v. Sullivan,* 446 U.S. 335, 344–45, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

In order to succeed on a claim of ineffective assistance of counsel, Petitioner must show (1) that counsel's representation was deficient and (2) that Petitioner was prejudiced by counsel's performance. *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052. If Petitioner makes an insufficient showing on one prong, there is no reason for a court deciding an ineffective assistance claim to address both components of the inquiry. *Id.* at 697, 104 S.Ct. 2052.

■ In order to demonstrate deficient representation, Petitioner must show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. Petitioner must overcome a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance under the circumstances. *Id.* at 689, 104 S.Ct.

2052; *Matthews v. Evatt,* 105 F.3d 907, 919 (4th Cir.1997).

 Petitioner bears the burden of proving prejudice. *Fields v. Attorney Gen. of Md.,* 956 F.2d 1290, 1297 (4th Cir.1992). In order to demonstrate prejudice, Petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Matthews,* 105 F.3d at 919 (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

### 1. The Penalty Phase

Petitioner claims that Malinski's representation was deficient in preparation for and during the penalty phase, and that this deficiency prejudiced the outcome of Petitioner's sentencing. Specifically, Petitioner contends that Malinski (1) failed to begin preparation for the penalty phase in a timely fashion; (2) failed to obtain or utilize any investigative resources for the mitigation case; (3) failed to adequately investigate mitigation evidence; (4) failed to retain an appropriate mental health expert; (5) incompetently introduced psychopathy and the PCL–R through Petitioner's own expert; (6) failed to properly challenge Dr. Ryan's testimony; and (7) failed to request a jury instruction consistent with the law and evidence concerning the alternative sentence to death. Petitioner argues that if Malinski had done these things, the mitigating evidence would have been strengthened, and the aggravating factors would have been lessened, because even the Government's expert may have testified that Petitioner had

a mental illness rather than psychopathy. However, Petitioner fails to show there is a probability sufficient to undermine confidence in the outcome that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

 First, Petitioner alleges that he was prejudiced by his defense team's failure to secure a jury instruction that Petitioner would receive life without parole if he did not receive the death penalty, or to at least ensure that the jury instructions regarding this issue were consistent. However, on direct appeal, the Fourth Circuit addressed the issues which form the basis of Petitioner's claim. If an issue was raised on direct appeal, it cannot form the basis of a claim of ineffective assistance of counsel on collateral review. *See Pruett v. Thompson,* 996 F.2d 1560, 1576 (4th Cir. 1993). The Fourth Circuit held that this Court was not constitutionally required to give the jury the type of instruction Petitioner contends his counsel should have sought. *United States v. Stitt,* 250 F.3d 878, 893 (4th Cir.2001). Additionally, the Fourth Circuit found that any confusion in the instructions "could neither affect Stitt's substantial rights nor seriously affect the integrity, fairness, or public reputation of judicial proceedings." *Id.* at 895. The Fourth Circuit's findings on direct appeal bar Petitioner's ineffective assistance of counsel claim on this issue.[4]

 Second, Petitioner makes a number of claims that essentially contend that Petitioner was prejudiced because his defense team failed to conduct a thorough and timely investigation of potential mitigating evidence, and therefore failed to present such evidence during the sentenc-

---

4. The Court notes that even if it reached the merits of Petitioner's claim, the findings of the Fourth Circuit on direct appeal would prevent a showing of prejudice. Petitioner

cannot show that there is a reasonable probability that the results of his sentencing would have been different if his defense team had sought different jury instructions.

ing phase, or in some cases presented detrimental evidence, and that these failures caused the jury to sentence Petitioner to death. Petitioner contends that if his defense team had acted competently they would have (1) prepared evidence in mitigation to present during the Department of Justice conference where the government requested to seek the death penalty; (2) hired a mitigation specialist and investigator; (3) prepared a psycho-social history; (4) obtained additional discharge summaries and complete records regarding the psychiatric treatments of Petitioner's mother; (5) given the mental health expert more time to review and become familiar with Petitioner's case; (6) done more research on Petitioner's family history, including mental illness, crime, substance abuse, and violence; (7) discovered Petitioner's exposure to lead as a child; (8) obtained an expert familiar with the PCL–R; (9) obtained an expert familiar with the issue of future dangerousness in federal prisons; (10) not raised the issue of psychopathy and the PCL–R in the defense case; (11) properly discredited Dr. Ryan's testimony in regards to future dangerousness and the PCL–R; and (12) potentially had Petitioner diagnosed as mentally ill.

The Court's recollection of the trial, the Court's review of the record, and even the Fourth Circuit's finding on direct appeal reveals that the aggravating factors in this case were overwhelming. *See Stitt,* 250 F.3d at 898–99. In contrast, the mitigating factors were "unremarkable." *Id.* Petitioner contends that the reason the

mitigating factors were unremarkable was because the substance of the evidence supporting the mitigating factors was deficient; not that the character or nature of the factors were lacking. The Court disagrees. There is nothing that suggests that even if the defense team had proceeded as Petitioner now claims they should have, the mitigating factors found by the jury would have been any less unremarkable in light of the overwhelming nature of the aggravating factors.[5] Petitioner does not suggest any additional mitigating factors should have been presented to the jury. Petitioner merely argues that the evidence supporting the mitigating factors would have been strengthened.

Petitioner argues that the full extent of Petitioner's family and childhood history was not presented to the jury. However, Petitioner's defense team put on sufficient evidence of his family history for eleven jurors to find that Petitioner was abandoned and neglected as a child, and for twelve jurors to find that he was subjected to a dysfunctional family setting in childhood and that he was deprived of parental guidance and protection.[6] This factor was fully considered by the jury and obviously not found to be sufficient to outweigh the aggravating factors. There is no indication that a more extensive examination of the subject would have resulted in a different conclusion on the part of the jurors.

Petitioner also contends that a proper mitigation defense would have shown that

---

5. The Petitioner does not argue, nor does the Court find any reason to believe that the Government would not have succeeded in its request to pursue the death penalty at the Department of Justice conference if Malinski had presented this evidence.

6. The Court also notes that three jurors found that other factors in Petitioner's background mitigated against imposition of the death penalty, and five jurors found that other factors demonstrated that mercy should be considered. It is not clear what these other factors were, but the evidence Petitioner believes should have been presented is clearly of this type, and the Court notes that some evidence of this nature was put into the record, even if it was not as extensive as Petitioner now claims it should have been.

Petitioner was not a psychopath, but instead suffered from mental illness and lead poisoning. Petitioner contends that if the experts had been confronted with proper evidence, they would have found that Petitioner *might* have been suffering from a bipolar disorder, a mood disorder, psychological and social maladjustment, morality deficits, poor impulse control, poor judgment, and substance abuse and dependence, and therefore not diagnosed him as a psychopath. (Decl. Dr. Cunningham ¶¶ 7–58; Decl. Dr. Ryan ¶¶ 16–18.) The fact that no jury members found Petitioner committed the offense under severe mental or emotional disturbance, nor found that Petitioner's ability to appreciate the wrongfulness of his conduct was significantly impaired, does support Petitioner's argument to the extent that it shows that not enough evidence was introduced for the jury to be persuaded of those mitigating factors. However, there is no reason to believe that the jury would have found that the mental illnesses, which Petitioner now claims the evidence could have shown, would have been found by the jury to be severe mental or emotional disturbances, or the type of mental deficiencies that would impair his ability to appreciate the wrongfulness of the murders Petitioner committed during the course of the CCE, or the wrongfulness of any of the other acts Petitioner committed as found in the non-statutory aggravating factors. In other words, Petitioner has not provided and the Court does not find any support for the notion that a jury would consider such things as "poor impulse control" or "bipolar disorder" to be the types of mental maladies that would have mitigated the nature of Petitioner's behavior. Additionally, even though Petitioner's alleged psychopathy was used as support for the argument that he would not be able to adjust to incarceration, three jurors did find that Petitioner would be able to adjust to the environment in federal prison, yet they still found the aggravating factors justified the death penalty. There is no indication that lack of evidence as to Petitioner's alleged psychopathy, or stronger evidence refuting such an allegation, would have outweighed the aggravating factors the jury found. In the final analysis, as the Fourth Circuit explained,

> [f]or each of the three murders during the CCE for which Stitt was charged, the jury found all of the statutory aggravating factors, and forty of the forty-six non-statutory aggravating factors, with which it was presented. Among the non-statutory aggravating factors found by the jury beyond a reasonable doubt were assault on a uniformed police officer, threatening to kill several deputy sheriffs and a uniformed police officer, participation in forcible home invasions, participation in a non-charged intentional killing to settle a drug related dispute, and ordering co-defendants to shoot a bouncer at a night club.

*Stitt,* 250 F.3d at 898. The Court has no doubt that even if Petitioner had been able to conduct his defense at the sentencing phase in the manner he now describes, Petitioner's argument would not have overcome the extensive and overwhelming nature of the aggravating factors found by the jury. Petitioner cannot demonstrate that he was prejudiced by the performance of his defense team, even if that performance was deficient. Having found that Petitioner was not prejudiced, the Court declines to address the performance of Petitioner's counsel. Accordingly, Petitioner's claim on these grounds is denied.

### 2. The Plea Bargain

■ Petitioner contends that Malinski was ineffective for failing to recommend that Petitioner accept the Government's offer of life without parole as part of a plea

bargain. To assess ineffective assistance of counsel, courts do not isolate the behavior of one member of a defendant's defense team, but rather take the performance of all the counsel together. *See, e.g., United States v. Alexander,* 789 F.2d 1046, 1051 (4th Cir.1986); *Soering v. Deeds,* 217 F.3d 840, 2000 WL 870490, at *5 (4th Cir.2000). Specifically relevant in this case, if the local co-counsel effectively represents a defendant, then the defendant cannot later claim ineffective assistance of counsel. *See Soering,* 217 F.3d 840, 2000 WL 870490, at *5.[7]

■ The standards of the American Bar Association ("ABA") may serve as a guide to what is reasonable, but only as a guide, not a determinative rule. *See Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052; *see also Jones v. Murray,* 947 F.2d 1106, 1110 (4th Cir.1991). The ABA standards for plea negotiations in a death penalty case state:

A. Counsel should explore with the client the possibility and desirability of reaching a negotiated disposition of the charges rather than proceeding to a trial. In so doing, counsel should fully explain the rights that would be waived by a decision to enter a plea instead of proceeding to trial, and should explain the legal and/or factual considerations that bear on the potential results of going to trial.

B. Counsel should ordinarily obtain the consent of the client before entering into any plea negotiations.

C. Counsel should keep the client fully informed of any continued plea discussion or negotiations, convey to the client any offers made by the prosecution for a negotiated settlement and discuss with the client possible strategies for obtaining an offer from the prosecution.

D. Counsel should not accept any plea agreement without the client's express authorization.

E. The existence of ongoing plea negotiations with the prosecution does not relieve counsel of the obligation to take steps necessary to prepare a defense. If a negotiated disposition would be in the best interest of the client, initial refusals by the prosecutor to negotiate should not prevent counsel from making further efforts to negotiate.

ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.6.1 (1989). The Guidelines also explain that "[w]here the client faces execution upon conviction, counsel should not let belief in the strength of the defense case, in his or her own ability as an advocate, or even in the client's innocence foreclose exploration of a negotiated settlement." *Id.* at cmt. However, defense counsel does not act unreasonably solely because he makes no effort to persuade his client to accept a plea. *Jones v. Murray,* 947 F.2d 1106, 1110 (4th Cir.1991).

■ In this case, Petitioner retained both Malinski and Swartz. Even if Malinski did not perform to an objectively reasonable level during the plea negotiations, it is clear that Swartz did. Swartz approached Malinski to encourage Malinski to attempt to obtain a plea bargain because of the strength of the case against Petitioner. (Decl. Swartz ¶ 7.) Malinski did have one meeting with AUSA Groene, and then Malinski told Swartz that he would not engage in any more negotiations with AUSA Groene. (Decl. Swartz ¶ 7.)

7. Although unpublished opinions are not binding as precedent in the Fourth Circuit, they may provide "helpful guidance" in situations where no published opinions speak to the issue. *In re Serra Builders, Inc.,* 970 F.2d 1309, 1311 (4th Cir.1992).

Malinski attempted no other plea negotiations before trial began. However, although no agreement was reached before the trial, Swartz was able to obtain an offer of a life sentence from the United States Attorney's Office. (Decl. Swartz ¶ 10.)

After the first day of the trial, Swartz and the attorneys for Petitioner's co-defendants were even more convinced that the Government's case was overwhelming against all the defendants, including Petitioner. (Decl. Fredericks ¶ 4; Decl. McMillin ¶ 4; Decl. Protogyrou ¶ 7; Decl. Swartz ¶¶ 7, 9.) Swartz believed it was in Petitioner's best interests to enter into a plea agreement and again tried to convince Malinski to enter plea negotiations. (Decl. McMillin ¶ 3; Decl. Swartz ¶ 9.) Swartz also requested that Douglas Fredericks ("Fredericks"), the attorney for co-defendant Kermit Brown, speak with Malinski. (Decl. Fredericks ¶ 5.) Fredericks, who had experience with death penalty cases before both federal district courts and the Fourth Circuit, advised Malinski that Fredericks thought it was likely that the death penalty was a serious possibility, and that Malinski should consider advising his client to accept the plea agreement for life imprisonment. (Decl. Fredericks ¶¶ 4–5.)

Malinski's response to these entreaties might justify Petitioner's complaint if Malinski had been the sole attorney on the defense team. Malinski told Fredericks that "client's [sic] don't pay me all this money to plead them guilty. They pay me to fight." (Decl. Fredericks ¶ 5; Decl. Swartz ¶ 9; Tr. 2255 Hr'g 8/2/04 at 91.) Malinski also told Fredericks that he believed even if a jury sentenced Petitioner to death, Malinski could re-argue the sentence before the Court. (Decl. Fredericks ¶ 6.) Malinski apparently expressed the same reasoning to Petitioner. (Decl. Pet'r ¶ 1.) Malinski expressed confidence throughout the trial that the defense was winning the case. (Decl. Fredericks ¶ 4.) Malinski's confidence appeared so misplaced to the other defense counsel that it became the basis of a joke among them. (Decl. Protogyrou ¶ 7.) Malinski later admitted that the evidence the Government offered was overwhelming, at least on the CCE charges, but added, "Was it a foregone conclusion that he [Petitioner] would be convicted? I mean, serendipity works, the world keeps turning. Anything can happen." (Tr. 2255 Hr'g 8/2/04 at 25.)

However, Petitioner was not left solely to the care of Malinski. Shortly after the trial began, Swartz received one final offer from the Government of life imprisonment in exchange for Petitioner's plea of guilty. (Decl. Swartz ¶ 11.) Swartz informed Petitioner that the Government had offered one final opportunity for Petitioner to plead guilty, and that Swartz considered the evidence against Petitioner to be overwhelming. (Decl. Swartz ¶ 11.) Petitioner then asked Malinski his opinion, and Malinski advised Petitioner that at that point he believed the case was going well. (Decl. Swartz ¶ 11; Decl. Pet'r ¶ 2.)

Petitioner argues that the Court should evaluate his claim only in the context of Malinski's advice, because Malinski was lead counsel and had a pre-existing relationship with Petitioner. (Decl. Swartz ¶ 11; Decl. Pet'r ¶ 2.) However, the Court can not ignore the fact that Swartz, an attorney with extensive experience in criminal proceedings, made numerous efforts to obtain plea agreements for Petitioner, and did his best to persuade Petitioner to accept those agreements. The fact that there was a disagreement between the two attorneys who Petitioner retained for his defense team does not negate the fact that Petitioner was presented with the opportunity to plead guilty and chose not to do so. Both Malinski and Swartz discussed with Petitioner the possibility that Petitioner

might receive the death penalty in this case. (Decl. Swartz ¶¶ 7, 9–11; Tr. 2255 Hr'g 8/2/04 at 25–26, 28–29, 90–91, 124–125.) Neither Swartz nor Petitioner allege that Malinski ever advised Petitioner not to accept the plea; at most, they assert that Petitioner inferred from Malinski's comments about the progress of the trial that Malinski believed Petitioner should not plead. Petitioner weighed the advice of his attorneys, and made the ultimate decision about whether to enter into the plea agreement. (Tr. 2255 Hr'g 8/2/04 at 152.) Petitioner cannot now claim ineffective assistance of counsel because he is dissatisfied with results of the choice he made. Petitioner has not shown that his defense team failed to perform to an objective level of reasonableness. Accordingly, Petitioner's claim of ineffective assistance of counsel during the plea negotiations is without merit.

### 3. Conflict of Interest

Petitioner claims that Malinski was ineffective because Malinski had conflicts of interest. Specifically, Petitioner contends that Malinski performed deficiently so as to ensure that he received the maximum amount of fees and to hide the nature of the payments he was receiving. The *Strickland* analysis is slightly modified when addressing a conflict of interest.

 To satisfy the performance prong of the *Strickland* test, a petitioner need only show that the counsel was engaged in an "actual conflict of interest." *United States v. Swartz*, 975 F.2d 1042, 1047–48 (4th Cir.1992). To satisfy the prejudice prong, the petitioner must then show that this actual conflict of interest

adversely affected the counsel's performance in defense of the petitioner. *Id.* at 1048. "[S]uch an actual conflict of interest may never be harmless error." *Id.*

During the trial, AUSA Groene made a claim in court that Malinski had received $500,000 in drug money for representing Petitioner. (Tr. 2255 Hr'g 8/2/04 at 14.) The Court conducted a short hearing *in camera* without the presence of the Government. (*Id.*) The matter was not pursued further. However, Malinski considered the question of the source of his fees to be a "hot spot" for the rest of the proceedings. (*Id.* at 76.)

It is not clear from the record exactly what were the sources of funds used to pay for Petitioner's defense. There was no written fee arrangement between Malinski and Petitioner. (*Id.* at 70.) Malinski and Swartz were paid flat fees for their services, with costs and expenses to be paid as they arose. (*Id.*) Malinski was to be paid between $75,000 and $100,000 for his portion of the flat fee, and Swartz was to receive between $50,000 and $75,000.[8] (*Id.* at 71, 113–14, 160.) Petitioner's family agreed to raise the money for any additional costs and expenses. (*Id.* at 70.) Kenneth "Boobie" Williams ("Williams") claims that he paid Malinski, through third parties, over $100,000 to represent Petitioner. (Decl. Williams ¶¶ 3–4.) It is not clear who these third parties were, but Maurica Stitt Johnson, ("Maurica Johnson"), Petitioner's maternal aunt, indicates that she was an intermediary between Malinski and a friend of Petitioner's in Florida named Robin Jones, who would provide the money. (Decl. Maurica Johnson ¶ 11.)

---

8. Malinski received most of his fee, but not directly from Petitioner. (Tr. 2255 Hr'g 8/2/04 at 71, 113–14.) Malinski contends that Swartz received all but $10,000 of his fee, and Malinski paid Swartz this $10,000 from the amount Malinski received. (*Id.* at 114.) Swartz contends that he was never paid the final portion of his fees. (*Id.* at 149.) The source of the disagreement may be that Malinski believes Swartz was to receive $50,000, and Swartz recalls that his fee was $75,000, but neither party has provided documentation to resolve this difference of recollection.

None of the money raised for expenses was placed in an escrow account; the money was simply requested from Petitioner's family when a particular expense arose.[9] (Tr. 2255 Hr'g 8/2/04 at 71.) Malinski claims that there were no costs in this case. (*Id.* at 100.) Malinski does not recall who paid him on Petitioner's behalf, nor does he know if only Petitioner's family made the payments. (*Id.* at 101–02.) He recalls that one payment had to be rejected because the source of the funds could not be verified. (*Id.* at 101.) Malinski could not even tell the Court whether he maintained any records as to what he was paid or what his expenses were. (*Id.* at 100–01.) Overall, the Court finds that Malinski was evasive and not credible in answering questions about the source of the funds, his expenditures, and his record-keeping.

▮ Petitioner first claims that Malinski failed to conduct adequate investigations or to hire appropriate experts, because these were expenses that would have been paid from the retainer given to Malinski, and Malinski wanted to keep the money. No retainer agreement was provided to the Court, and none of the affidavits provided by Petitioner contradict Malinski's assertion that he and Swartz were guaranteed flat fees up front for their services. Malinski contends that the money he received as a fee did not include any amount of funds that was to be used for hiring experts. (Tr. 2255 Hr'g 8/2/04 at 44.) The money for Dr. Cunningham was supposed to have been raised by Petitioner's family, but the family could only provide enough money to pay for Dr. Pasquale. (*Id.* at 43, 45.) Therefore, Malinski claims that he could not have kept any money that would have been used for Dr. Cunningham or any other expert because that money was never raised. (*Id.* at 43.)

The Court cannot find that Malinski had any conflict of interest on these grounds because there is no indication that the money Malinski received for his representation was directly correlated to money that would be paid for experts or other fees and costs.

By the same token, the Court cannot find any merit to Petitioner's second claim that Malinski refused to counsel Petitioner to accept the plea agreement because Malinski was concerned that he would have to give back a portion of his payment. Malinski had no plans to give back the money even if there had been a plea agreement. (*Id.* at 29.) Nothing in the record before the Court indicates that the flat fee arrangement made prior to the trial would have been changed if Petitioner had pleaded guilty.

Petitioner contends in his third claim that Malinski lied about his experience with capital cases in order to ensure that he was able to continue in his representation and receive his fee. Petitioner's contention is intertwined with Petitioner's claim of denial of learned counsel in a capital case, which the Court finds to be without merit. *See* discussion *infra* Part III.B. Malinski believed he had the necessary experience to represent Petitioner in this case. (Tr. 2255 Hr'g 8/2/04 at 99–100.) Petitioner has not demonstrated that Malinski had a conflict of interest. Even if the Court was to find that Malinski did have a conflict of interest, Petitioner was not prejudiced by Malinski's behavior because Petitioner was not guaranteed counsel learned in capital cases under the circumstances of this case. *See* discussion *infra* Part III.B.

Petitioner's fourth claim is that Malinski's conflict of interest caused him to fail

**9.** Malinski asked Maurica Stitt to mortgage her house at one point to raise money for Petitioner's defense. (Decl. Maurica Stitt ¶ 10.)

to ask the Court to appoint experts for Petitioner during the sentencing phase. It is clear that Malinski sought to avoid a Court inquiry into the source of funds paid to him in order to protect his own self-interest. Under cross-examination by counsel for Petitioner, Malinski admitted that he was concerned about the source of his fees.

Q. Did you think about going to the Judge and asking him for resources to hire a mitigation investigator?

A. Probably thought about it.

Q. You didn't do it, correct?

A. That's correct.

Q. And why didn't you do it?

A. Didn't think it was going to work.

[ . . . .]

Q. Can you explain why?

A. Just that was my impression, and it also was going to involve a discussion under oath of various family members in connection with available resources, and I thought that there was a problem potentially there.

Q. And it could have required you to divulge the sources of your fee arrangements, the amount of money you had received, and that of Mr. Swartz, too, correct?

A. Since Mr. Groene had already started in on me, that was going to be a hot spot.

Q. And you didn't want to go down that road, right?

A. Absolutely not.

[ . . . .]

Q. Okay. And you understood that—it was your understanding that Mr. Stitt himself didn't have the resources to pay for mitigation investigator, and psychologist, and all of that; is that correct?

A. That's correct.

Q. So you knew under the law that Mr. Stitt was entitled to the provision of such services?

A. Yes.

(Tr. 2255 Hr'g 75–76.) The Court followed up with Malinski in an effort to get Malinski to elaborate on what "problems" he believed would have been caused by such a request.

Court: Did you ever recommend to [...] Mr. Stitt, that he ask the Court to appoint any of the experts that you felt you needed?

A: No.

C: I think the explanation was because of the entanglement you had already had regarding funds with the United States?

A: Yes. Well, that was part of it. And the other part of it was that if the Court was going to conduct an extended inquiry on resources, I was concerned that there could be some problems there.

[ . . . .]

C: And what did you feel would be the problem with the Court doing an inquiry regarding Mr. Stitt's ability to pay since we would be talking about his ability to pay per se as opposed to your ability to pay?

A: That's correct.

C: So what did you think was the problem with the Court doing an inquiry into Mr. Stitt's ability to pay?

A: I just believe there could have been a problem there.

C: Can you detail the problem you think there would have been inquiring into his funds, his resources?

A: I can't tell you specifically. I just believed there would have been a problem or could have been a problem. It didn't jump out at me.

C: Did you have a discussion with Mr. Stitt to let him know that you were

not going to ask the Court to appoint an expert or pay for the fees because of your concern that there may be a problem during the inquiry.

A: No, I don't think we ever had that discussion.

C: So you never told him you were not going to ask?

A: No, I thought that we were getting it covered by Maurica Stitt and told him about Dr. Cunningham, and we told him that we did not have the ability to hire Dr. Cunningham, and then went and hired Dr. Pasquale.

(Tr. 2255 Hr'g 8/2/04 at 102–04.) Malinski knew that Petitioner did not have the financial resources to pay for the experts that Malinski initially contacted, and that the Court could appoint such experts for Petitioner. Malinski never discussed this option with Petitioner, nor informed Petitioner of Malinski's decision not to pursue it. Malinski took it upon himself to determine that the inquiry which would accompany a request for appointed experts would cause too many problems, problems which Malinski cannot—or will not—now articulate to the Court. However, Malinski does make clear that his concern was not only for the protection of his client and his client's family. Malinski also sought to protect his own financial interests because of the Government's inquiry into the source of payments made to him. A conflict may be created by the attorney's own personal interests. *United States v. Tatum*, 943 F.2d 370, 376 (4th Cir.1991). It is obvious that Malinski labored under an actual conflict of interest.

The Court must next address whether the conflict of interest had an adverse affect on the performance of counsel's defense team. This analysis is distinctly dif-ferent from "nice calculations as to the amount of prejudice" Petitioner has suffered. *Tatum*, 943 F.2d at 375 (quoting *Glasser v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 86 L.Ed. 680 (1942)). Therefore, the fact that the Court has already found that Petitioner has not shown preju-dice from counsels' failure to retain experts and a mitigation specialist beyond those who were retained [10] is not germane to the conflict of interest analysis. *See Cuyler v. Sullivan*, 446 U.S. 335, 349–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

The key factor here is that Malinski's decision not to utilize or even advise his client of the alternate way to obtain other experts was a decision he made in his own self-interest. The *Tatum* Court explained that:

[w]hen the attorney is actively engaged in legal representation which requires him to account to two masters, an actual conflict exists when it can be shown that he took action on behalf of one. The effect of his action of necessity will adversely affect the appropriate defense of the other. Moreover, an adverse effect may not always be revealed from a review of the affirmative actions taken. Rather, the failure to take actions that are clearly suggested from the circumstances can be as revealing. Thus, the failure of defense counsel to cross-examine a prosecution witness whose testimony is material or the failure to resist the presentation of arguably inadmissible evidence can be considered to be actual lapses in the defense.

*Tatum*, 943 F.2d at 376. The failure of counsel to undertake some professional duty on behalf of his client because of the conflict of interest amounts to an adverse effect. *See id.*

█ Defense counsel has a duty to conduct a thorough and complete investi-

10. *See* discussion *supra* Part III.A.1.

gation of a defendant's background for the purpose of developing mitigation evidence. *Kandies v. Polk,* 385 F.3d 457, 469 (4th Cir.2004)(quoting *Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Wiggins v. Smith,* 539 U.S. 510, 523–34, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052). It is true that counsel is not required to investigate "every conceivable line of mitigating evidence," nor to retain a mitigation expert. *Kandies,* 385 F.3d at 469–70. However, counsel has a duty to make reasonable decisions regarding the extent of the investigation. *Beaver v. Thompson,* 93 F.3d 1186, 1195 (4th Cir. 1996).

In this case, Malinski discovered that neither Petitioner nor Petitioner's family could afford the experts that Malinski wanted to use. At that point, rather than making a request for funding from the Court, Malinski settled on one expert he could afford. While Petitioner was not able to show that he was prejudiced by the substitution of Dr. Pasquale for Dr. Cunningham, or the lack of any other mitigation experts or investigator, the Court finds that Malinski's decision to employ Dr. Pasquale, and only Dr. Pasquale, was solely a choice made because of the financial situation. This is not a reasonable basis for the decision, because the circumstances suggest that Malinski could have obtained court-appointed experts. There is no doubt that Dr. Cunningham would have been the stronger expert.[11] Additionally, a mitigation investigator might have discovered the more thorough documentation of Petitioner's background that Petitioner now presents to the Court. Ma-

linski was clearly acting to protect his own financial interests by failing to even discuss the option of court-appointed experts and an investigator with Petitioner.

██ If local counsel had intervened, Malinski's performance might not have adversely affected Petitioner's representation. *See Soering,* 217 F.3d 840, 2000 WL 870490, at *5. However, no other member of Petitioner's defense team compensated for Malinski's deficient performance. Therefore, the Court finds that Malinski had an actual conflict of interest and that it adversely affected the performance of Petitioner's defense team. Accordingly, prejudice to Petitioner is presumed.

The Court must finally determine whether Petitioner waived his Sixth Amendment right to conflict-free representation. *Swartz,* 975 F.2d at 1048 (citing *United States v. Akinseye,* 802 F.2d 740, 744–45 (4th Cir.1986)). The record does not reflect that Petitioner made a knowing, intelligent, and voluntary waiver of this right. As noted above, Malinski did not discuss the option of court-appointed experts with Petitioner. Thus, Malinski's conflicted rationale for not seeking court-appointed experts was not disclosed to Petitioner. It is impossible, therefore, for Petitioner to have knowingly and intelligently waived this conflict. *See Swartz,* 975 F.2d at 1049. The Court can only conclude that Petitioner was prejudiced by Malinski's performance. Accordingly, Petitioner's claim of ineffective assistance of counsel is granted.

**B. Denial of Learned Counsel in a Capital Case**

Petitioner contends that he was denied counsel learned in the law applicable to

**11.** Dr. Cunningham had first-hand experience with federal prisons, unlike Dr. Pasquale, who had only seen an HBO television special on federal prisons. Malinski's attack on the PCL–R was guided by his consultation with

Dr. Cunningham, therefore having Dr. Cunningham testify first-hand regarding the PCL–R would have given more weight to this line of attack.

capital cases. Specifically, Petitioner asserts that 18 U.S.C. § 3005 guarantees him the right to two counsel, at least one of which must be learned in capital cases. Petitioner misconstrues the statute.

 Section 3005 provides that when a defendant is charged with a capital crime, "the court before which the defendant is to be tried, or a judge thereof, shall promptly, *upon the defendant's request,* assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases." 18 U.S.C. § 3005 (emphasis added). Petitioner relies upon language in *United States v. Watson,* 496 F.2d 1125, 1129 (4th Cir.1973), which held that a defendant has "an absolute statutory right to two attorneys under § 3005." Petitioner takes this language out of context. In *Watson,* the defendant requested a second appointed attorney, but the request was denied. *Id.* at 1125–26. Immediately after stating that defendant had this "absolute statutory right," the *Watson* court continued, "Having concluded that defendant was denied a right that he possessed *and sought to exercise...* " *Id.* (emphasis added). It is clear that before § 3005 is triggered, a defendant must request the appointment of counsel. Petitioner retained his own counsel in this case, and never requested additional counsel from the Court. Nor was the Court under any obligation to inform Petitioner of his right to request such counsel. *United States v. Williams,* 544 F.2d 1215, 1218–19 n. 4 (4th Cir.1976).

Petitioner also asserts that the statute requires that one of his two counsel be learned in the law applicable to capital cases. Again, Petitioner takes the statutory language out of context. The statute requires that in cases where the court appoints counsel for a defendant in a capital case, at least one of those counsel must be so learned. 18 U.S.C. § 3005. However, the statutory language in no way confers a general right to learned counsel for capital defendants. Petitioner never made a request for counsel in this case, and therefore the Court was not bound to ensure that Petitioner had counsel learned in capital case law.[12] Additionally, the Court notes that Petitioner and Malinski had an attorney-client relationship prior to this case. (Decl. Pet'r ¶ 2; Tr. 2255 Hr'g, 8/2/04 at 8.) It is not as if Petitioner was simply choosing a lawyer out of the Yellow Pages.

Petitioner argues that this is an impermissible distinction made between defendants with retained counsel as opposed to appointed counsel. This distinction is only impermissible in the context of the Sixth

---

12. The Court notes that even though it was not bound by § 3005 to ensure the qualifications of Petitioner's retained counsel in a capital case, the Court did consider the matter. The Court specifically asked Malinski as the trial was beginning whether he had capital experience. (Tr. Trial at 5.) Malinski told the Court, "In my 25 years I have handled several of them [capital cases]." (*Id.*) Malinski later admitted that his experience with capital cases had never included a trial, but that he still believed he had the necessary experience to represent Petitioner in this case. (Tr. 2255 Hr'g 8/2/04 at 93–100; *see* Decl. Hush ¶¶ 3–16.) Additionally, Swartz is a veteran practitioner, well-known to the Court, and very experienced in criminal cases. As Swartz points out, he prosecuted capital cases when he was an attorney for the Commonwealth of Virginia, and he has represented criminal defendants since 1970, although he had never been defense counsel in a capital case. (Decl. Swartz ¶ 1.) Petitioner contends that Swartz did not have a significant role in the defense of Petitioner, and thus his qualifications and experience should be irrelevant. The local rules of this Court do not allow for such a distinction in responsibility for the representation of a client to be made. E.D. Va. Local Crim. R. 57.4(D) & (F). Regardless of which attorney's advice Petitioner eventually chose to follow, Petitioner had the advantage of Swartz's counsel and the opportunity to make use of it.

Amendment. *Mickens,* 535 U.S. at 169 n. 2, 122 S.Ct. 1237. Petitioner fails to recognize that the learned counsel requirement in this case is statutory, not a Sixth Amendment guarantee. Because the protection is triggered only by the statutory language in cases of appointed counsel, the holdings of *Mickens* and its predecessors do not apply. Petitioner's claim under § 3005 is without merit.

## C. The Thirteenth Juror

Petitioner contends that a thirteenth juror was present during deliberations and that Petitioner was thus prejudiced. Petitioner appears to base this upon the trial transcript that indicates thirteen jurors were polled as to the jury's verdict. Petitioner has secured the declaration of an alternate juror, Lawrence G. Traynor ("Traynor"). Traynor states, "At the close of the guilt phase of the trial, I participated in deliberations, I voted on whether Mr. Stitt was guilty or innocent, I re-entered the courtroom and was polled as to the verdict. I recall standing and affirming the verdict." (Decl. Traynor ¶ 3.) The Court finds that the record contradicts Traynor's declaration.

Prior to deliberations, Traynor was one of the four alternate jurors the Court specifically released, admonishing them not to violate the Court's restrictions regarding contact. (Tr. Trial at 5098.) The Court notes that the version of the transcript available to the parties does record that a thirteenth juror, Mr. Robert P. Boyd ("Boyd"), one of the alternates, was polled. (*Id.* at 5136.) Having reviewed the tapes of the court reporter, the Court finds that this was a mistake in transcription. Regardless, there is no record that Traynor was ever polled. The record does not indicate that Traynor was involved in deliberations as Traynor indicated in his declaration. Furthermore, the records of the clerk of court indicate that neither Traynor nor Boyd reported for jury duty during deliberations nor received reimbursement for any service during deliberations. Finally, on each day of deliberations, the Court had counsel for the parties confirm the presence of the correct number of jurors as they reported for duty in the courtroom. (Tr. Trial at 5108, 5112, 5117, 5124, 5130, & 5132.) Additionally, the Court visually inspected all the jurors each time they reported to the courtroom. It is exceedingly unlikely that the presence of Traynor—or any other extra juror—among the jury would have gone unnoticed by the ten attorneys present in the courtroom, the Court, and the court staff. The Court finds that no thirteenth juror was present during deliberations. Petitioner's claim is without merit.

## D. Evidence as to Leadership Role

Petitioner asserts that the Government withheld evidence that tended to show that Petitioner was not the leader of the organization in Portsmouth, Virginia, as the Government alleged. Specifically, Petitioner contends that the Government had information that indicated that Williams was the leader of the conspiracy, and that Petitioner was merely one of Williams's enforcers. Petitioner argues that the testimony of the witness Shawn Davis ("Davis") could have impeached the testimony of witnesses such as Ivan Harris ("Harris").

 "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This includes material that may not be known to the prosecutor but is known to the police. *Monroe v. Angelone,* 323 F.3d 286, 299 (2003)(citing *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490

(1995)). To establish a *Brady* violation, Petitioner must show (1) the evidence was favorable to him; (2) the evidence was willfully or inadvertently suppressed by the Government; and (3) his defense was prejudiced by this suppression at trial. *Monroe,* 323 F.3d at 299–300 (citing *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

The evidence in the record upon which Petitioner relies is a declaration by Davis that he told police investigators certain information prior to Petitioner's trial that he was not asked at trial. Davis claims that he told investigators that Petitioner was associated with one of two rival gangs from Miami, Florida, who were now in Portsmouth, Virginia. (Decl. Davis ¶ 2.) Davis indicates that the gang to which Petitioner belonged included individuals that Davis knew as "Hi tech," [13] "K–9," "Bear," "Out Law," "Mid–Night," and "S.D." (*Id.* at ¶ 2.) In April of 1997, Davis saw "Hi tech" in Portsmouth with Petitioner. Davis states that no one ever asked him, but that he "always had the impression that Stitt worked under those Miami Guy's [sic]." (*Id.* at ¶ 5.) The Government has not provided any testimony in rebuttal.

■ Essentially, the evidence that Davis's testimony would have provided is that Petitioner was part of a "gang" based in Miami that included Williams, that Williams was once in Portsmouth with Petitioner, and that Davis got the impression that Petitioner took directions from Williams. Petitioner claims that this statement tends to show that Petitioner did not make the decisions as to who to kill in Portsmouth. On the contrary, nothing in Davis's testimony contradicts the overwhelming evidence presented during the trial that Petitioner was the leader of the conspiracy in Portsmouth, and that the murders for which Petitioner was convicted were done at Petitioner's discretion and direction. In fact, Davis's testimony serves only to indicate that Petitioner was part of a larger criminal enterprise than the Government proved at trial, covering at least two cities in two different states.

The Court does not find that evidence that Petitioner was engaged in an even larger conspiracy is favorable to Petitioner. Nor can the Court find that the lack of Davis's testimony prejudiced Petitioner's defense. If Petitioner was in fact a member of this larger criminal enterprise taking directions from Williams, Petitioner would obviously have been aware of such fact. Petitioner had every opportunity to raise this fact during the guilt and sentencing phases of the trial, even if Petitioner had no knowledge of Davis's statement to the investigators. Petitioner cannot now claim that he was prejudiced because Davis's statement was not made available to him. Accordingly, Petitioner cannot demonstrate all the elements needed to establish a violation of *Brady.* Petitioner's claim is denied.

### E. Constitutionality of the Death Penalty

First, Petitioner contends that *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) requires the Court to re-sentence Petitioner. Specifically, Petitioner contends that his Fifth Amendment rights were violated because the grand jury did not indict Petitioner on the aggravating factors that made Petitioner eligible for the death penalty pursuant to 21 U.S.C. § 848(n)(1)-(12). However, the Fourth Circuit has held that *Ring* does not apply retroactively to cases already final on direct review in either a Fifth or Sixth

---

**13.** Davis did not know it at the time of his observations, but later discovered that "Hi tech" was Williams. (Decl. Davis ¶ 4.)

Amendment context. *United States. v. Roane,* 378 F.3d 382, 396 n. 8 (4th Cir.2004)(citing *Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 2526, 159 L.Ed.2d 442 (2004)). Petitioner's contention is meritless.

 Second, Petitioner contends that *Ring* invalidated the death penalty provisions under 21 U.S.C. § 848(e) and the Federal Death Penalty Act, 18 U.S.C. §§ 3591–98 ("FDPA") as unconstitutional. Petitioner argues that the statutes are defective in that they place the discretion as to whether to charge the offense for the death penalty in the hands of the prosecutor, rather than the grand jury. The Fourth Circuit has considered this argument in the context of the FDPA and rejected it. *United States v. Barnette,* 390 F.3d 775, 788–90 (4th Cir.2004). This Court finds the same reasoning applies to Petitioner's challenge to 21 U.S.C. § 848(e). Therefore, Petitioner's claim is wholly without merit.

## F. Expert Testimony for the Government

Petitioner contends that his sentence should be vacated because the testimony of the Government's expert, Dr. Ryan, was based upon unsupported scientific assumptions, and Dr. Ryan has now recanted that testimony.

 When a witness recants testimony, a new proceeding should be held when (1) the court is "reasonably well satisfied" as to the falsity of the testimony, (2) the jury might have reached a different conclusion without that testimony, and (3) the party seeking the new proceeding did not know the testimony was false until after the original proceeding or was unable to respond to the testimony because that par-

ty was taken by surprise by the testimony. *United States v. Wallace,* 528 F.2d 863, 866 (4th Cir.1976)(quoting *Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir. 1928)).

First, the Court is reasonably satisfied that Dr. Ryan's testimony was erroneous.[14] Dr. Ryan's material testimony predicted Petitioner's future dangerousness based upon a scientific instrument that Dr. Ryan now believes he inaccurately applied. At the time of Petitioner's trial, Dr. Ryan did not realize that the PCL–R was not an accurate predictor of prison violence, as opposed to future dangerousness in the community at large. (Decl. Dr. Ryan ¶¶ 3, 5, 8.) Dr. Ryan indicates that the scientific literature has come to reflect the view that the PCL–R is not a reliable predictor of future dangerousness of individuals confined in a federal prison, and the Government has not provided any evidence to refute this claim. (*Id.* at ¶¶ 9–10.) The Court has not found any precedent providing guidance in a situation where an expert witness has discovered that the scientific basis for a test used to support a material fact was incorrect. However, if a DNA test indicated that an individual was guilty of a crime, and the Government's DNA expert later discovered that a change in DNA science indicated that the old test was inherently flawed, the Court cannot conceive that this would not be sufficient basis for the Court to at least consider such a petitioner's collateral attack. Therefore, the Court finds that Dr. Ryan's testimony was erroneous and has been recanted.

It is also possible the jury might have reached a different conclusion if Dr. Ryan's testimony had been different. The

---

**14.** The Court notes that the *Lassiter* test appears to use the term "false" broadly, to include any testimony that is found to be "not true." The intent of the witness has no bearing on the "falsity" of the testimony. However, to avoid any confusion in this case, the Court emphasizes that it does not find that Dr. Ryan intended to present false testimony.

Court only has to find that "there is more than a faint possibility of a different jury verdict but something less than a probability." *Wallace*, 528 F.2d at 866 n. 3. Given the nature of Dr. Ryan's testimony about the nature and consequences of Petitioner's psychopathy, the Court finds that it is clear that the jury might have reach a different verdict.

 The Court cannot find, however, that Petitioner was surprised by the testimony nor that Petitioner lacked knowledge of the problems with Dr. Ryan's application of the PCL–R. Malinski spoke specifically with Dr. Cunningham about the PCL–R testimony Dr. Ryan was to give, and Dr. Cunningham described it as "BS." (Tr. 2255 Hr'g 8/2/04 at 46.) During cross-examination, Malinski spent a significant amount of time attacking Dr. Ryan's testimony about the PCL–R, based upon Malinski's conversation with Dr. Cunningham. (Tr. 2255 Hr'g 8/2/04 at 47;.Tr. Death Penalty at 1010, 1019–57.) In addition, Malinski put on his own expert, Dr. Pasquale, to both attack the credibility of the PCL–R and to counter the findings of the PCL–R. (Tr. Death Penalty at 789–96, 805–12.) Clearly Petitioner was aware of the nature of Dr. Ryan's testimony and made a substantial effort to address the validity and effects of that testimony. Petitioner cannot satisfy the requirements set forth in *Wallace* for a new hearing. Accordingly, Petitioner's claim for a new hearing on this ground is denied.

## IV. CONCLUSION

For the reasons set forth above, the Motion of Petitioner to Vacate, Set Aside or Correct a Sentence Previously Imposed pursuant to 28 U.S.C. § 2255 is **GRANTED**. Petitioner's sentence on Counts Three, Five, and Seven is **VACATED** and **SET ASIDE**.

The Court has the option to resentence Petitioner or correct the sentence as may appear appropriate. 28 U.S.C. § 2255. The Court has "a 'broad and flexible' power... 'to fashion an appropriate remedy.'" *United States v. Hillary*, 106 F.3d 1170, 1171–72 (4th Cir.1997)(quoting *United States v. Garcia*, 956 F.2d 41, 45 (4th Cir.1992)). Generally, the most appropriate remedy is resentencing. *Hillary*, 106 F.3d at 1172. The Court shall schedule a hearing to correct the sentence as may appear appropriate.

The Court **DIRECTS** the Clerk to mail a copy of this Order to counsel for Petitioner and Respondent.

**IT IS SO ORDERED.**